UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

REBECCA LYNN TURNER,
Administrator of the Estate of
CONNIE SUE WOMACK STEVER, Deceased,

    *Plaintiff*,

v.                                                 No. _____
                                                     **TRIAL BY JURY DEMANDED**

SYFAN LOGISTICS, INC.,
       Serve: James M. Coyle, Registered Agent
                 200 Main Street, Ste. 600
                 Gainesville, GA 30501

    *Defendant*.

## COMPLAINT FOR WRONGFUL DEATH

COMES NOW the Plaintiff, Rebecca Lynn Turner, Administrator of the Estate of Connie Sue Womack Stever, by counsel, and alleges as follows for her Complaint for wrongful death pursuant to Section 8.01-50, *et seq.* of the Code of Virginia, against Defendant Syfan Logistics, Inc.:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff Rebecca Lynn Turner is a citizen of the Commonwealth of Virginia, and a resident of Rockingham County, Virginia. Ms. Turner qualified on December 16, 2014, in the Circuit Court for Rockingham County, as the Administrator of the Estate of Connie Sue Womack Stever, her mother. *See* Letter of Qualification, attached as Exhibit 1.

2. Connie Sue Womack Stever died tragically in an automobile versus tractor trailer wreck in the early morning of November 13, 2014, in Rockingham County. She is survived by Rebecca Lynn Turner, her daughter; Brian Womack, her son; Latasha Womack, her daughter; Candace Dinges, her daughter; Shane Stever, her son; and Tracey Coleman, her daughter. At the time of her death, Ms. Stever was a citizen of West Virginia

3. Defendant Syfan Logistics, Inc. was, at all times relevant hereto, a corporation incorporated under the laws of Georgia and with its principal place of business in Gainesville, Georgia, engaged in interstate shipping and the brokerage of shipping services. Syfan holds itself out as specializing in hauling deadline-sensitive, perishable food products, either by using its own fleet of trucks and trailers or brokering for the services of independent carriers to haul for Syfan's customers.

4. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000. Venue is proper in this district under 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this claim occurred in this judicial district.

**GENERAL ALLEGATIONS**

5. In November of 2014, Ms. Stever was a 54 year old mother of six. She lived just over the Virginia line, in Mathias, West Virginia. Ms. Stever would wake up early every morning and commute to Rockingham County to work at the Cargill facility in Timberville.

6. At approximately 5:50 a.m. on November 13, 2014, Ms. Stever was driving to work eastbound on Route 259 (Brocks Gap Road) near its intersection with Route 612 (Runions Creek Road).

7. In November of 2014, DD Logistics was an Illinois business entity engaged in the interstate hauling of freight. It was therefore registered with the United States Department of Transportation, US DOT No. 2173983, and subject to the regulation and oversight of the Federal Motor Carrier Safety Administration (FMCSA).

8. Leading up to November 2014, DD Logistics had displayed a flagrant, willful and prolonged disregard for the FMCSA regulations, to wit:

   a. in its most recent Compliance Review by the FMCSA, DD Logistics was found to have committed "critical" violations of the regulations regarding maximum hours of service by its drivers (49 CFR 395.3) and duty status records of its drivers (49 CFR 395.8), and had been given an "unsatisfactory" rating for its failure to comply with 49 CFR Part 395 (Hours of Service of Drivers) and 49 CFR Part 392 (Driving of Motor Vehicles);

   b. in the one-year period from December 18, 2012 through December 18, 2013, DD Logistics drivers were cited 58 times for hours of service violations;

   c. in the following one-year period from December 19, 2013 through December 18, 2014, DD Logistics drivers were cited 72 times for hours of service violations;

   d. at least 4 of DD Logistics' drivers in the one-year period from December 19, 2013 through December 18, 2014 were "disqualified drivers" pursuant to 49 CFR 383.51, meaning the drivers should not have been behind the wheel of a commercial motor vehicle at all;

   e. in November of 2014, among all motor carriers nationwide, DD Logistics ranked in the bottom 4th percentile for driving safety, and the bottom 10th percentile for hours of service compliance;

   f. in October of 2014, among all motor carriers nationwide, DD Logistics ranked in the bottom 4th percentile for driving safety, and the bottom 11th percentile for hours of service compliance;

   g. in September of 2014, among all motor carriers nationwide, DD Logistics ranked in the bottom 3rd percentile for driving safety, and the bottom 10th percentile for hours of service compliance;

   h. in August of 2014, among all motor carriers nationwide, DD Logistics ranked in the bottom 2.7th percentile for driving safety, and the bottom 9.7th percentile for hours of service compliance;

    i. in July of 2014, among all motor carriers nationwide, DD Logistics ranked in the bottom 2nd percentile for driving safety, and the bottom 8th percentile for hours of service compliance;

    j. in June of 2014, among all motor carriers nationwide, DD Logistics ranked in the bottom 1.9th percentile for driving safety, and the bottom 8.5th percentile for hours of service compliance;

    k. DD Logistics' nationwide ranking in these categories was similarly deplorable since at least April of 2012, evincing a willful pattern and practice on the part of DD Logistics to violate, and to permit its drivers to violate, the FMCSA regulations.

    l. In a compliance review conducted by the FMCSA on August 22, 2013, DD Logistics was cited for "critical violations" in Part 395 of the FMCSA regulations, and was thus given a "conditional" safety fitness rating. DD Logistics appealed this rating, which appeal was denied in February 2014 because DD Logistics "failed to provide sufficient evidence that the critical violations have been addressed and the DD Logistics Inc. dba DD Logistics' current operation meets the safety fitness standard specified in 49 CFR section 385.5."

9. This information about DD Logistics' performance was readily available on the FMCSA website and/or other reasonably available means on and before November 12, 2014. Indeed, there were literally large yellow caution signs, (*e.g.* ⚠) all over the FMCSA website and the FMCSA SAFER report for DD Logistics. Thus, anyone interested in knowing could have readily ascertained DD Logistics' chronically poor track record in complying with the FMCSA regulations, and could readily have ascertained that its drivers' continual violations of these regulations would put others, such as Ms. Stever, at the risk of serious bodily injury and death.

10. In November of 2014, James Patterson was a truck driver employed by Defendant DD Logistics, Inc., driving a truck and trailer owned by DD Logistics. He was 44 years old, and by that time had amassed an extensive record of criminal and traffic charges and

convictions. Upon information and belief, those charges and/or convictions include, but are not limited to:

    a. driving under the influence – (Virginia 1991);

    b. driving on a suspended license (Virginia 1991);

    c. driving on a suspended license (Virginia 1990);

    d. driving on a suspended license (Virginia 1989);

    e. driving on a suspended license (Virginia 1988);

    f. sufficient major and/or minor offenses, as defined by Va. Code § 46.2-351 (repealed 1999), to have been declared a habitual offender by the Commonwealth of Virginia, which disqualifies him from maintaining a Commercial Driver's License;

    g. driving a motorcycle without an operator's permit (Florida 2011);

    h. grand theft (Florida 2003);

    i. trafficking or endeavoring to traffic in stolen property (Florida 2003);

    j. aggravated assault (Florida 1996);

    k. felony possession of marijuana (Florida 1998);

    l. sexual battery of a minor (Florida 1998);

    m. criminal mischief in excess of $1,000 (Florida 1996);

    n. battery (Florida 1996);

    o. driving on a suspended license (Florida 1993);

    p. contempt of court (Florida 1993).

11. The extensive nature of Patterson's criminal record could easily have been discovered by virtue of a reasonable, commercially available background search tool.

12. At approximately 5:50 a.m. on November 13, 2014, Patterson was driving westbound on Route 259 (Brocks Gap Road) near its intersection with Route 612 (Runions Creek Road).  Working for DD Logistics, Patterson was hauling a "reefer" trailer[1] full of frozen chicken from a Pilgrim's Pride Corp. facility in Tennessee to a Pilgrim's Pride facility in Moorefield, West Virginia.

13. At that time, Patterson, having been declared a habitual offender, had no privilege even to be operating a motor vehicle in Virginia, much less a commercial tractor trailer weighing roughly 80,000 pounds.

14. Nevertheless, upon information and belief, and in keeping with the known propensity of DD Logistics drivers, Patterson had been driving for more than 11 hours, or was driving beyond the 14th consecutive hour after coming on duty, all in violation of 49 CFR 395.3. He was also unlawfully in possession of a controlled substance, namely oxycontin.  And he had also been using caffeine supplements to keep himself awake.

15. Route 259 is a two-lane, mountain road with numerous sharp curves and uphill and downhill grades.

16. Nevertheless, as Patterson proceeded westbound, he was speeding, and was also distracted by the GPS system in his tractor and/or his cell phone.

17. The road curved to the right, but Patterson did not, causing him to cross the double yellow line into the oncoming traffic lane.  He drove completely through the oncoming traffic lane, off the road and into a yard, where he clipped a large tree.  *See* photo of property damage attached as Exhibit 2.

---

[1] A reefer trailer is one that contains a refrigeration unit to keep the goods being hauled chilled or frozen during transit.

18. After hitting the tree, Patterson attempted to steer his tractor trailer back onto the roadway into the oncoming traffic lane.  As he did so, Ms. Stever was approaching from the opposite direction, driving into the curve that Mr. Patterson was concurrently failing to negotiate.

19. Ms. Stever would have been staring directly at the front of Patterson's tractor trailer, and likely would have been able to see the two large skull decals with which Patterson had adorned the grill of his tractor trailer.  *See* photo of tractor trailer grill attached as Exhibit 3.

20. Patterson failed to navigate his tractor trailer safely back into the roadway.  Instead, as he got to the edge of the road, his tractor trailer rolled over on its side, directly on top of Ms. Stever's vehicle and crushing it.  Because it still had so much momentum due to Patterson's excessive speed, the tractor trailer then slid approximately 100 feet down the road in a westbound direction, dragging Ms. Stever's vehicle underneath it.

21. The tractor trailer crushed Ms. Stever's SUV, pinning her inside.  *See* photo of Ms. Stever's vehicle attached as Exhibit 4.  Ms. Stever was deceased by the time anyone was actually able to access her body, and it is unknown how long she suffered inside her crushed vehicle before she expired.

22. Upon information and belief, DD Logistics had not been hired directly by Pilgrim's Pride to haul the chicken from Tennessee to West Virginia.  Rather, Pilgrim's Pride had used Syfan to manage and coordinate its shipping needs, including the hiring of motor carriers to haul Pilgrim's Pride's chicken.

23. Syfan had therefore hired DD Logistics to haul this particular load of frozen chicken for Pilgrim's Pride.

24. Syfan logistics holds itself out as a third-party logistics provider, actively interjecting itself into the relationship between shipper and carrier.

25. The details and compensation for this particular engagement was documented by a "Load Confirmation" between Syfan and DD Logistics, attached hereto as <u>Exhibit 5</u>.

26. The Load Confirmation document is notable in multiple respects. First, it imposes a penalty for being late, (<u>Ex. 5</u>), and indeed Syfan touts to its customers its ability to manage the "most demanding delivery schedules" and claims that "when others say 'no,' the only answer you'll hear from Syfan Expedited is 'yes.'" (*See* <u>Exhibit 6</u>.) Syfan thus creates a culture and expectation of speed, placing expediency and on-time delivery above all else.

27. Second, the Load Confirmation—although in smaller print than everything else—indicates that by accepting the engagement, the carrier (DD Logistics) agrees that it will comply with all federal and state rules, and explicitly references compliance with state and federal hours of service rules and regulations. As much of an ineffective throwaway as this fine-print proviso might be, it nevertheless highlights Syfan's awareness of the importance of the motor carriers it hires complying with the applicable rules and regulations, and specifically the hours of service regulations.

28. Upon information and belief, Syfan took absolutely no steps, and certainly no reasonable steps, to determine DD Logistics' ability and willingness to comply with applicable rules and regulations, and specifically the hours of service regulations. Nor did it conduct any kind of inquiry into the fitness of the DD Logistics' drivers who would be hauling freight on Syfan's behalf. Had Syfan undertaken any kind of reasonable inquiry, it would have discovered DD Logistics' deplorable refusal to ensure that its drivers complied with

applicable rules and regulations, and specifically the hours of service regulations. Syfan would have been fully aware of DD Logistics' chronic dangerousness on the roadways, and surely no reasonable actor would have hired DD logistics had it known of DD Logistics' record. Syfan also would have been aware of Patterson's deplorable driving record and unfitness to drive in the Commonwealth.

29. The wreck that killed Ms. Stever happened because a DD Logistics driver was behaving exactly as anyone would have predicted a DD Logistics driver would behave after even the most cursory review of the publicly available information about DD Logistics' safety practices—Patterson was in a hurry, in violation of the hours of service regulations, flagrantly disobeying the traffic laws, and likely to cause a collision.

## COUNT 1 – NEGLIGENT HIRING AND RETENTION

30. All preceding allegations are incorporated by reference herein.

31. Syfan owed a duty to third persons, such as Ms. Stever, to exercise reasonable care to employ a careful and competent contractor or employee to do work that involves a risk of physical harm unless it is skillfully and carefully done.

32. The operation of a tractor trailer and the hauling of freight on public roadways involves a risk of physical harm unless it is skillfully and carefully done.

33. When engaged by Syfan in November 2014 and for an exceedingly long time prior to this specific engagement, DD Logistics and/or Patterson were incompetent or unskilled to perform the job for which they had been hired by Syfan, in that DD Logistics and/or Patterson did not possess the skill, experience, and available equipment which a reasonable man would realize that a contractor or employee must have in order to operate a tractor trailer and haul freight on the public roadways without creating unreasonable

risk of injury to others, and also did not possess the personal characteristics which are necessary to perform such tasks safely.

34. Syfan knew or should have known of DD Logistics' and Patterson's incompetence and lack of skill. Yet Syfan failed to exercise reasonable care to investigate the fitness and safety records of DD Logistics and its drivers, and further failed to exercise reasonable care in the selection and retention of motor carriers.

35. Syfan breached its duties to third persons, including Ms. Stever, in hiring and retaining an incompetent and unskilled motor carrier.

36. Ms. Stever's death was a direct and proximate result Syfan's breach, in that the death arose out of DD Logistics' and/or Patterson's incompetence and lack of skill. Her death arose out of the same qualities of DD Logistics' and Patterson—including but not limited to chronically unsafe driving practices and failure to adhere to hours of service rules and regulations—that made it negligent for Syfan to hire them in the first place.

37. As a result of the aforesaid, Ms. Stever's statutory beneficiaries have suffered damages as set forth below.

## DAMAGES

38. All preceding allegations are incorporated herein by reference.

39. Ms. Stever is survived by Rebecca Lynn Turner, her daughter; Brian Womack, her son; Latasha Womack, her daughter; Candace Dinges, her daughter; Shane Stever, her son; and Tracey Coleman, her daughter.

40. As a result of the acts and omissions of Syfan as described above Ms. Stever's children have suffered damages under Section 8.01-52 of the Code of Virginia, to wit:

     a. sorrow, mental anguish, and solace, including society, companionship, comfort, guidance, kindly offices and advice of Ms. Stever;

     b. loss of services, protection, care and assistance provided by Ms. Stever; and

     c. funeral expenses.

WHEREFORE, for the reasons set forth above, Plaintiff demands judgment against Syfan Logistics, Inc. in the amount of TEN MILLION DOLLARS ($10,000,000.00) in compensatory damages. In addition, Plaintiff is entitled to interest at the statutory rate from November 13, 2014, pursuant to §8.01-382 of the Code of Virginia, and her costs in this behalf expended.

**TRIAL BY JURY DEMANDED**

                                   Respectfully submitted,

                                   REBECCA LYNN TURNER,
                                 Administrator of the Estate of
                                 CONNIE SUE WOMACK STEVER, Deceased,

                                   By Counsel

     /s/ E. Kyle McNew
E. Kyle McNew, Esquire (VSB No. 73210)
J. Gregory Webb, Esquire (VSB No. 38157)
MICHIE HAMLETT LOWRY
  RASMUSSEN & TWEEL PLLC
500 Court Square, Suite 300
Post Office Box 298
Charlottesville, Virginia 22902
(434) 951-7200; (434) 951-7218 Facsimile
gwebb@michiehamlett.com
kmcnew@michiehamlett.com

*Counsel for Plaintiff*