# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Harrisonburg Division

REBECCA LYNN TURNER,
Administrator of the Estate of
CONNIE SUE WOMACK STEVER, Deceased,

     *Plaintiff*,

v.                                                                  No. 5:15-cv-81

SYFAN LOGISTICS, INC.,

     *Defendant.*

---

## PLAINTIFF'S OPPOSITION TO DEFENDANTS MOTION TO DISMISS
## FOR LACK OF PERSONAL JURISDICTION, *FORUM NON CONVENIENS*,
## AND FOR FAILURE TO STATE A CLAIM

Plaintiff, Rebecca Lynn Turner, Administrator of the Estate of Connie Sue Womack Stever, by counsel, opposes Defendant Syfan Logistics, Inc.'s Motion to Dismiss (Docket No. 6). For the reasons stated below, the Motion should be denied.

## INTRODUCTION

Syfan hired DD Logistics—a motor carrier with an absolutely abysmal safety and compliance record—to haul a time-sensitive load from eastern Tennessee to West Virginia. The most direct route, most logical route required driving through Virginia, and indeed Syfan's contract with DD Logistics was based on a route through Virginia. DD Logistics' driver caused a wreck in Virginia that killed Connie Stever. Ms. Stever's Personal Representative has therefore sued Syfan in Virginia for its negligence in hiring DD Logistics, a theory of liability

1

specifically recognized by Judge Conrad in *Jones v. C.H. Robinson Worldwide, Inc.*, 558 F. Supp. 2d 630 (W.D. Va. 2008).

Syfan now moves to dismiss on three bases. First, it claims that contracting to haul a time-sensitive load through Virginia is insufficient to establish personal jurisdiction over Syfan in Virginia. But to the contrary, contracting to move goods through a state in furtherance of your commercial objectives of prompt delivery for your customers is exactly the kind of foreseeable, purposeful availment of and contact with that state that makes it imminently reasonable to expect that you will have to answer for tortious injury caused by your negligence in that state. Second, and in the alternative, Syfan contends that Virginia is not a convenient forum in which to litigate this claim because, according to Syfan, all of the relevant evidence and witnesses are located in Georgia. But again to the contrary, Virginia is absolutely the most convenient forum to litigate a claim arising out of a death in Virginia. The majority of the witnesses regarding the wreck itself are located in Virginia, and the Plaintiff and the majority of the statutory beneficiaries are located in Virginia. The only witnesses located in Georgia are Syfan's witnesses. While it is understandable that Syfan would prefer to litigate in its own backyard, that is not a sufficient basis to reuire transferring the case under *forum non conveniens*. Third, Syfan contends that, despite this Court specifically recognizing this kind of claim in *Jones*, Plaintiff fails to state a claim because of legislation that was recently passed by Congress. This contention also fails because, among many reasons, this new legislation by its terms applies only as of the day after its enactment, which occurred in late November 2015. Ms. Stever was killed more than a year earlier, so this new legislation has no bearing on this claim. Syfan's motion should, therefore, be denied.

## FACTUAL BACKGROUND

This case arises out of a tractor trailed versus small SUV crash on November 13, 2014, in Rockingham County, just outside of Harrisonburg. Connie Stever, a citizen of West Virginia, was driving eastbound to go to work at a Cargill facility in Rockingham County. She was killed when a tractor trailer driven by James Patterson, an employee of DD Logistics, ran off the road, then came back on the road and rolled onto Ms. Stever's SUV. (Compl. ¶¶ 2, 5-6, 10, 12, 15-21.) At the time of the crash, Mr. Patterson was speeding, distracted, and driving in violation of the federal hours of service regulations. (Compl. ¶ 14, 16.)

Prior to the crash, DD Logistics had a simply atrocious track record in terms of driver safety and regulatory compliance. As set forth at paragraph 8 of Plaintiff's Complaint, in the two years leading up to this crash DD Logistics drivers had been cited numerous times for hours of service violations. In the months leading up to this crash, DD Logistics was never out of the bottom 10% in driver safety among all federally-licensed motor carriers nationwide, and rarely broke double digits in hours of service compliance, and had displayed a similar disdain for the rules of the road for at least the previous two years. (Compl. ¶ 8a-l.) In and prior to November 2014, all of this information was readily available to the public via the Federal Motor Carrier Safety Administration (FMCSA) website. One could enter the carrier name or DOT number and instantly obtain what is known as a BASIC report that provides a snapshot of the carrier's scores in the metrics that FMCSA kept track of. Or, for a nominal fee one could access the more comprehensive SAFER report, which provides an immense amount of historical data for a carrier. The SAFER report for DD Logistics as of December 2014 is attached hereto as Exhibit

1, and details DD Logistics' chronically low safety scores and the resulting "conditional" approval rating.[1]

At the time of this crash, DD Logistics was hauling a "reefer" trailer filled with poultry. DD had been hired to do so by Syfan, who was acting as a broker or third-party logistics provider on behalf of Pilgrim's Pride Corp. (Compl. ¶ 22-24.) Because discovery has not yet commenced, the exact nature and scope of Syfan's business is not precisely known. However, based on its website, Syfan appears to be a relatively large outfit. Syfan holds itself out as working "with the nation's largest foodstuffs companies in the poultry, seafood, confectionary, cereal and soft drink industries" and "the world's largest package-delivery companies as well as the expedited divisions of America's major automotive manufacturers." (Exhibit 2.) The main page of Syfan's website has a list of large, national customers scrolling along the bottom, such as Pilgrim's Pride, Hostess, UPS, Perdue, Sysco, and Pepsico. *See* (http://www.syfanlogistics.com/index.php (last visited Dec. 30, 2015). Indeed, the list includes Cargill, which has several facilities in the Harrisonburg / Rockingham County area, including the facility to which Ms. Stever was travelling on her way to work the morning she was killed. *Id.*

Syfan purports to own its own fleet of trucks and trailers and also provides freight management and brokerage services with its "reliable, pre-qualified team of core carriers," all in furtherance of its "100% commitment to on-time pick-up and delivery" of "deadline-sensitive perishable food products." (Exhibit 2.) With regard to its brokerage services to shippers like Pilgrim's Pride and Cargill, Syfan says it is "prepared to serve all your shipping needs within the

---

[1] When the FMCSA scores a carrier, the higher the score, the worse the carrier performed. In other words, while being at or above the 90th percentile may be a good thing in terms of LSAT scores or IQ tests, it is a bad thing for a federally licensed motor carrier.

continental United States, Mexico and Canada." (Exhibit 3.)  Indeed, Syfan appears to recognize the need for its team of carriers to have high safety scores when it represents that its "flexible and virtually unlimited capacity is built on the shoulders of our own private fleet combined [sic] a partnership with the country's top twenty-five percent of carriers."  (Exhibit 3.)

Syfan specifically markets its services to customers like Pilgrim's Pride and Cargill, holding itself out as specializing in "meeting the demanding, product-sensitive deadlines of the poultry industry."  (*Id.*)  "For the highest priority loads with the most demanding delivery schedules," such as poultry, Syfan promises "a unique sensitivity to deadline-oriented product shipping."  (Exhibit 2.)  Thus, "[w]hen others say 'no,' the only answer you'll hear from Syfan Expedited is 'yes.'"  (*Id.*)

The specific load for which Syfan hired DD Logistics was documented by a "Load Confirmation," which is attached hereto as Exhibit 4.[2]  The Load Confirmation is a Syfan document that specifies the carrier as DD Logistics, Inc.  On the first page, under the "Order" heading, the Load Confirmation indicates that the load will be 40,000 pounds of fresh poultry to be hauled in a 53 foot reefer trailer at 26 degrees, and it indicates a mileage of 527 miles.

The Load Confirmation specifies that the load will be picked up at a Pilgrim's Pride facility located at 1300 Market Street, Chattanooga, Tennessee, and that the delivery location is 214 S. Main Street, Moorefield, West Virginia.  Putting those starting and end points into any commercially available mapping or GPS program produces a handful of possible routes, the most direct of which run through Virginia.  (*See* Exhibit 5.)  The quickest route—*i.e.* the route that best allows Syfan to keep its promise of "100% commitment to on-time pick-up and delivery" of

---

[2] The Load Confirmation was also attached to Plaintiff's Complaint as Exhibit 5 (Docket No. 1-5).

"deadline-sensitive perishable food products"—runs through Virginia, and is the route that DD's driver was taking when this wreck occurred. Indeed, to get from Chattanooga, Tennessee to Moorefield, West Virginia by land in anywhere close to the 527 miles specified by the Load Confirmation, one would necessarily have to travel through Virginia.

In keeping with the emphasis on its website regarding on-time delivery and tight deadlines, Syfan's Load Confirmation places a heavy emphasis on DD logistics being on time and communicating with Syfan. If DD Logistics was going to be late either picking the load up or delivering it and failed to communicate this fact to Syfan, DD Logistics faced a $300 penalty. (Ex. 4 at 2.) If the driver was more than thirty minutes late, there was a $100 late fee. (Id.) Syfan explicitly instructs the drivers that "any issues or delays concerning the load must be communicated to Syfan Logistics ASAP when they happen." (Id. at 3.) And given this emphasis on celerity, the fastest route between Chattanooga and Moorefield is through Virginia.

## ARGUMENT

A. **This Court may properly exercise jurisdiction over Syfan.**

This Court recently set forth the analytical framework for addressing the question of personal jurisdiction:

> Before exercising personal jurisdiction over a non-resident defendant, a court must find that two conditions are satisfied: first, that the state's long-arm statute "authorizes the exercise of jurisdiction in the circumstances presented;" second, that "the exercise of jurisdiction comports with Fourteenth Amendment due process standards." *Ellicott Mach. Corp., Inc. v. John Holland Party Ltd.*, 995 F.2d 474, 477 (4th Cir. 1993). Because Virginia's long-arm statute, Virginia Code § 8.01-328.1, extends personal jurisdiction to the extent permitted by the Due Process Clause, *see English & Smith*, 901 F.2d at 38, "the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one." *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135-36 (4th Cir. 1996). The question, then, is whether the defendant has sufficient "minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co.*

*v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Determining the reach of judicial power over persons outside of a state's borders under the *International Shoe* standard is undertaken through two different approaches—by finding specific jurisdiction based on conduct connected to the suit, or by finding general jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). With regard to specific jurisdiction, which is of concern here, a court is required to evaluate "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiff['s]claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs. Inc.*, 334 F.3d 390, 397 (4th Cir. 2003) (citing *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 711-12 (4th Cir. 2002) & *Helicopteros*, 466 U.S. at 414 & n.8)).

*DIRECTV, LLC v. Saylor*, No. 5:13cv111, 2015 U.S. Dist. LEXIS 42947, at *28-29 (W.D. Va. Mar. 31, 2015). Virginia is a "single act" state, meaning that jurisdiction may exist even where the defendant has conducted only a single act in the Commonwealth, as long as that act was purposeful and meaningful. *Liberty Mut. Fire Ins. Co. v. Menozzi Luigi & C. S.p.A.*, 92 F. Supp. 3d 435, 440 n.4 (E.D. Va. 2015). The question is not simply where the contacts predominate, but rather "whether enough minimum contacts with the forum exist such that the district court's assumption of specific jurisdiction does not offend due process.'" *DIRECTV*, 2015 U.S. Dist. LEXIS 42947, at *27 (quoting *Production Group Int'l, Inc. v. Goldman*, 337 F. Supp. 2d 788, 798 (E.D. Va. 2004). Finally, the Court may decide the question on the basis of the pleadings and materials filed in support and the allegations in the Complaint, drawing "all reasonable inferences arising from the proof, and resolv[ing] all factual disputes, in the plaintiff's favor" to determine whether the plaintiff has established a "*prima facie* case of personal jurisdiction." *Mylan Labs., Inc. v. Akzo, N. V.*, 2 F.3d 56, 60 (4th Cir. 1993).

1. **Syfan purposefully availed itself of Virginia when it commissioned DD Logistics to carry the load for which Syfan was responsible on a route that necessarily and intentionally ran through Virginia.**

Syfan's customers pay Syfan to make sure that their cargo gets from Point A to Point B on time. Thus, even though Syfan may never take possession of the cargo, the cargo is nevertheless Syfan's responsibility. Syfan can haul the cargo itself or, as it did here, serve as a broker between the customer and a third-party carrier. The premise of the Plaintiff's claim in this case is that Syfan negligently hired a dangerous, incompetent carrier to haul cargo for Syfan's commercial benefit.

Syfan hired this incompetent carrier to drive. This is not a case where someone was driving to get to a job for which he had been hired by Syfan, such that driving was merely incidental to the job. Driving was the job. Syfan caused this dangerous carrier to begin its route in Chattanooga Tennessee, and told the carrier to drive the load to Moorefield, West Virginia, knowing full well that to do so would require the carrier to drive through Virginia. Syfan thus placed drivers on the roads of Tennessee, Virginia, and West Virginia at risk of being injured or killed by the dangerous carrier that Syfan hired.

Thus, the question is whether Syfan's knowingly causing its contractor to drive through Virginia to accomplish Syfan's commercial purpose of driving satisfies the purposeful availment / minimum contacts analysis for personal jurisdiction purposes. The answer is that it absolutely does.

The lead Supreme Court case on the purposeful availment question is *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985). The starting point in the analysis is foreseeability, in the sense of whether, based on "the quality and nature of the defendant's activity" the defendant's "conduct and connection with the State are such that he should reasonably anticipate being haled

into court there." *Id.* at 474-75. That question, in turn, looks at whether there is "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State." *Id.* at 475. This "purposeful availment" inquiry is satisfied when "the defendant's contacts with the forum state proximately result from actions by the defendant himself that create a substantial connection with the forum State" as opposed to the contacts being "random, fortuitous or attenuated." *Verizon Online Servs. v. Ralsky*, 203 F. Supp. 2d 601, 612-13 (E.D. Va. 2002) (quoting *Burger King*).

Judge Lee's opinion in *Verizon* provides a very useful analogy to the present case. There, Verizon was suing email spammers for tortious damages to Verizon's servers and infrastructure. The spammers were located in Minnesota, and were sending spam email to millions of email addresses. Many of those emails were to Verizon customers all over the country, and thus went through Verizon servers that were located in Virginia. Like Syfan, the defendants claimed that Virginia lacked personal jurisdiction over them. Specifically, they claimed that they had no idea where these emails they were sending would go once they pressed "send" and that emails merely passing through servers in Virginia was not a sufficiently purposeful contact within Virginia's borders to allow for personal jurisdiction. This, of course, is analytically identical to what Syfan argues here—they are essentially saying that their carrier's (DD Logistics) merely passing through Virginia on its way from Chattanooga to Moorefield was the carrier's decision, and does not constitute purposeful availment by Syfan of the privilege of conducting activities within Virginia.

Judge Lee disagreed. He observed that the spammers' conduct, like Syfan's, was motivated by pecuniary gain. *Id.* at 604. By deliberately transmitting their spam email through Verizon's servers, which were located in Virginia, the spammers caused tortious injury in

Virginia. "Allowing Defendants to escape personal jurisdiction in a forum they have exploited for pecuniary gain while causing a tort to a Virginia resident would constitute a manifest unfairness to the rights of Verizon and the interests of Virginia." *Id.* Judge Lee further observed that a defendant cannot "avoid jurisdiction by asserting ignorance of where" its product was travelling. *Id.* "When a business directs [spam] advertising of its products to a Virginia ISP and causes a tort within Virginia, the business tortfeasor is purposefully availing itself of the laws of Virginia and thereby subjects itself to long-arm jurisdiction in Virginia within the contours of the Constitution." *Id.*

Though here we are dealing with the interstate instead of the internet, the analysis is generally the same. Syfan caused DD Logistics to drive Syfan's client's cargo from eastern Tennessee to West Virginia. The most direct route between those two points requires driving on Virginia's roads. In specifying a mileage in the Load Confirmation that is only possible to achieve by driving through Virginia, Syfan knew full well that part of the driving for which it hired DD Logistics would have to occur in Virginia. Thus, Syfan's contact with Virginia was not random or fortuitous, or even merely foreseeable. It was expected, anticipated, and purposeful in furtherance of Syfan's promise to its customer to get this perishable load of poultry to its destination as fast as possible. Indeed, Syfan directly benefitted from its carrier driving through Virginia as opposed to taking some circuitous route that avoided Virginia—no shipper is going to hire a broker that sends the shipper's perishable cargo on meandering routes as opposed to the most direct route. Thus, in furtherance of its own commercial objectives, Syfan placed Virginia residents at risk and caused a tort to occur in Virginia.

Syfan's tries to distance itself from DD Logistics by claiming that it did not "control the methods, means or details of the transportation of the shipment by DDL as all such decisions

were made solely by DDL" and that it did not "direct or compel DD to travel in or through Virginia." (Docket No. 6-1 at 2.) Syfan would thus have this Court believe that when it brokers a load for one of its clients, it has absolutely no knowledge of or interest in what actually happens to that cargo, how it is delivered, and what route it takes to get to its destination. This head-in-the-sand claim simply ignores the facts of this specific case, as well as "the quality and nature" of Syfan's activities. When Syfan hired DD Logistics to drive a time-sensitive load from Chattanooga to Moorefield based on a mileage that can only be accomplished by driving through Virginia, Syfan clearly directed that the load be driven through Virginia. If DD Logistics did not do so and was late as a result, it would have been penalized by Syfan. Moreover, the quality and nature of Syfan's business essentially places it in the role of quarterback. Though someone else may actually carry the load, Syfan calls the play. And here, Syfan called a play that required driving through Virginia, and in so doing caused a death to occur in Virginia. Syfan absolutely purposefully availed itself of the privilege of engaging in commercial activity in Virginia.

The next question—whether Ms. Turner's claim arises out of Syfan's activities directed at Virginia—is simple. Syfan commissioned DD Logistics to drive a tractor trailer with cargo for which Syfan was responsible on a route that Syfan knew would involve driving through Virginia. The wreck that is the subject of this lawsuit occurred in Virginia, and Connie Stever died in Virginia. Thus, this claim absolutely arises out of Syfan's activities directed at Virginia.

The final question is whether exercise of personal jurisdiction would be constitutionally reasonable. And again, Ms. Turner respectfully suggests that the answer to this question is simple. The difficult personal jurisdiction questions typically involve situations where the defendant places its product into the stream of commerce, such that it is arguably foreseeable that the product would pass through or end up in any given state, but where the defendant did not do

anything to make it any more likely that the product would pass through or end up in one state as opposed to any other state. In those cases, the defendant's contact with the given state is arguably fortuitous, perhaps even arbitrary, such that saying the defendant should be subject to suit in that given state would be constitutionally unreasonable.

This case is not even close to those kinds of cases. Here, Syfan did not simply release this load of cargo into the world with no interest in or influence upon where it went or what route it took to get there. It dictated to DD Logistics where to pick up the cargo and where to take it. Because the cargo was perishable, Syfan had an interest in seeing the cargo get there quickly, and indeed based its contract with DD Logistics on the shortest possible route. That route necessarily went through Virginia, and this wreck occurred in Virginia. Syfan's contact with Virginia in this case was neither fortuitous nor arbitrary. Rather, it was expected, directed, and purposeful. There is thus nothing unreasonable about subjecting Syfan to the jurisdiction of Virginia.[3]

For these reasons, Ms. Turner respectfully suggests that this Court absolutely has specific personal jurisdiction over Syfan, and that Syfan's motion should therefore be denied.

---

[3] By way of example, the more difficult question would arise if, instead of taking the most direct route through Virginia, DD Logistics' driver had taken an indirect route to get from Chattanooga to Moorefield, such as east through North Carolina or northwest through Kentucky, and the wreck had occurred in one of those states. Could Syfan be sued in North Carolina or Kentucky? It is arguably foreseeable that a driver may decide to take such an indirect route. But that certainly would not have been what Syfan expected when it promises its customers quick delivery and when its contract for that particular load is based on a mileage that would be impossible to achieve by going through North Carolina or Kentucky. Indeed, one can easily imagine Syfan's response to such a suit: "Look at this Load Confirmation. We expected them to go directly through Virginia. We had no idea he would go through North Carolina/West Virginia." Thankfully, this case does not present anywhere near as close of a question as the hypothetical posed in this footnote does.

2. **Ms. Turner does not presently contend that Syfan is subject to general personal jurisdiction in Virginia, but there is strong reason to believe that it is.**

Because there has not yet been any discovery, there is a lot about Syfan that Ms. Turner does not yet know. For purposes of the present motion, she does not presently have a sufficient factual basis to allege, in keeping with Rule 11, that Syfan's contacts with Virginia are "so 'continuous and systematic' as to render [it] essentially at home in" Virginia. *Daimler AG v. Bauman*, U.S. , 134 S. Ct. 746, 761 (2014) (quoting *Goodyear Dunlop Tires Ops., S.A. v. Brown*, U.S. , 131 S. Ct. 2846, 2851 (2011)). Thus, Ms. Turner cannot presently ask the Court to find that Syfan is subject to general jurisdiction in Virginia.

That said, there is strong reason to suspect that Syfan would, in fact, be subject to general jurisdiction in Virginia. Syfan's website boasts of its ability to serve its customers' shipping needs throughout the United States. It also boasts of it client base that includes "the nation's largest foodstuffs companies in the poultry, seafood, confectionary, cereal and soft drink industries" and "the world's largest package-delivery companies as well as the expedited divisions of America's major automotive manufacturers", (Exhibit 2), such as Pilgrim's Pride, Hostess, UPS, Perdue, Sysco, Pepsico, and Cargill. Thus, it is highly unlikely that this was the first time a Syfan-brokered load was hauled through Virginia, or even that such an event is uncommon. Pilgrim's Pride—Syfan's customer on this occasion—has at least one facility in Virginia (*see* Exhibit 6), and may have as many as three, in Harrisonburg, Timberville, and Broadway (*see* Exhibit 7), plus facilities in eastern Tennessee and West Virginia. It is therefore highly likely that Syfan has arranged for Pilgrim's Pride cargo to be hauled to, from, and through Virginia on a regular basis. The same can be said for Syfan's other customers. At the very least, Cargill, Sysco, and Pepsico appear to have multiple locations in Virginia.

It also notable to consider what Syfan itself says and does not say in the affidavit it attaches to its motion to dismiss (Docket No. 6-5). First, at paragraph 5 the affidavit states that Syfan "does not operate any tractor trailers [sic] commercial motor vehicles." This conflicts directly with its website, where it states "Syfan owns its own fleet of trucks and trailers." (Ex. 2 at 1.) Perhaps Syfan draws a distinction between "operating" tractor trailers and owning them, but if so, it is notable that Syfan would try to draw such a distinction, and to consider what it is trying not to say in drawing such a distinction. In any event, if Syfan owns its own trucks and trailers, it is highly likely that those trucks and trailers routinely travel to, from and through Virginia given Syfan's focus on the poultry industry.

Second, in its memorandum, Syfan cites paragraphs 3 and 5 of the affidavit for the proposition that it does not "manufacture any goods that are shipped to Virginia" and "is not shipping goods it owns into Virginia." (Docket No. 6-1 at 6, 7.) As an initial point, that is not exactly what the affidavit itself states, but rather is counsel's paraphrasing of the affidavit. But setting that minor quibble aside, these statements are notable for what they do not assert. These statements essentially say that Syfan does not make or own any goods, and therefore does not ship any of its own goods to Virginia. Fair enough. But conspicuously absent from this assertion is any claim that Syfan does not regularly and routinely ship its customers' goods into or out of Virginia. Surely if Syfan could make such a broad claim in furtherance of its opposition to personal jurisdiction in Virginia, it would. Syfan's silence on whether it ships its customer's goods from or to Virginia is deafening.

To be sure, all there is to go on right now is inference and educated assumption. But the fact remains that all signs point to Syfan having a regular, routine and systematic presence in Virginia, such that Virginia likely would be able to assert general jurisdiction over Syfan.

### 3. In the alternative, Plaintiff requests that the Court authorize discovery in aid of jurisdiction.

For the reasons stated above, Ms. Turner believes she has more than established a prima facie case of specific personal jurisdiction over Syfan in Virginia in this case. However, should the Court have any doubt, Ms. Turner respectfully requests that she be granted leave to conduct discovery in aid of jurisdiction.

District courts have broad discretion to grant discovery on the question of personal jurisdiction. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 402-03 (4th Cir. 2003). "Absent a developed record, 'a trial court should allow plaintiffs the opportunity to discover facts to support jurisdictional allegations.'" *Vogel v. Boddie-Noell Enters.*, Civil No. WDQ-11-0505, 2011 U.S. Dist. LEXIS 92374, at *11 (D. Md. Aug. 17, 2011) (quoting *EEOC v. Alford*, 142 F.R.D. 283, 286 (E.D. Va. 1992)). "When plaintiff can show that discovery is necessary in order to meet defendant's challenge to personal jurisdiction, a court should ordinarily permit discovery on that issue unless plaintiff's claim appears to be clearly frivolous." *Rich v. KIS Ca., Inc.*, 121 F.R.D. 254, 259 (M.D.N.C. 1988).

Here, even if the Court is not yet satisfied that Ms. Turner has already established a prima facie case of personal jurisdiction, it certainly cannot be said that her claim of personal jurisdiction under these facts is "clearly frivolous." The facts already in the record strongly suggest that Syfan knew, expected, and intended that this load of cargo would pass through Virginia, and that doing so was in Syfan's commercial interests. Jurisdictional discovery would therefore be appropriate to determine, among other things, Syfan's customers' expectations when they hire Syfan to broker their cargo, what communications Syfan had with DD Logistics regarding Syfan's expectations when it hires DD Logistics to haul freight, DD Logistics's

understanding of those communications, what it means in the interstate hauling industry for Syfan to base a contract on a certain mileage, etc. Jurisdictional discovery would also be appropriate to determine the level and nature of Syfan's commercial contacts with Virginia generally to determine whether there is a basis for general jurisdiction.

Again, Ms. Turner cannot state strongly enough how unnecessary she believes jurisdictional discovery to be, because the case for specific personal jurisdiction is already so clear. Ms. Turner only makes this request for jurisdictional discovery in the alternative should the Court not be satisfied of its jurisdiction already.

**B.** **Dismissal or transfer under *forum non conveniens* is not appropriate.**

Syfan takes the position that because it is based in Georgia and decided to hire DD Logistics in Georgia, Ms. Turner's allegations "do not touch or concern the Commonwealth of Virginia." (Docket No. 6-1 at 9.) This claim is astounding for its myopia. The decision that Syfan made in Georgia to hire a chronically unsafe motor carrier put thousands of Virginia drivers at risk and resulted in a fatality in Virginia that killed the mother of multiple Virginia citizens. Ms. Turner's allegations therefore absolutely do "touch or concern the Commonwealth of Virginia." For the reasons stated below, Virginia is a perfectly acceptable forum in which to litigate this case.

28 U.S.C. § 1404 permits a district court to transfer a case to any other jurisdiction in which it might have been brought, if doing so would be in the interests of justice in light of the convenience of the parties and the witnesses. "District courts within this circuit consider four factors when deciding whether to transfer venue: (1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of

justice." *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs.*, 791 F.3d 436, 444 (4th Cir. 2015) (addressing *forum non conveniens* argument).

      **1.     Ms. Turner's choice of Virginia as a forum is entitled to great deference.**

"As a general rule, a plaintiff's 'choice of venue is entitled to substantial weight in determining whether transfer is appropriate.'" *Id.* (quoting *Bd. of Trs. v. Sullivant Ave. Props., LLC*, 508 F. Supp. 2d 473, 477 (E.D. Va. 2007)). "Given the substantial weight accorded to this first factor, Defendants need to make a compelling showing on the remaining factors to persuade" the Court to transfer the case to some other forum. *Id.* Here, Ms. Turner chose to bring this claim in Virginia, and for good reason. Her mother was killed in Virginia, she and three of her siblings live in Virginia, and her counsel is located in Virginia. She certainly cannot be accused of forum shopping or anything of that nature. The most logical place to bring a tort claim is the place where the tort occurred. In this case, that is Virginia, and so Ms. Turner's choice of forum is entitled to substantial deference that should only be disturbed for very compelling reasons.

Furthermore, contrary to what Syfan claims at page 13 of its brief (Docket No. 6-1 at 13), Georgia likely would not recognize Plaintiff's claim under Restatement (Second) of Torts § 411 for negligent hiring of a contractor. *See, e.g.*, *Finley v. Lehman*, 463 S.E.2d 709, 711 (Ga. Ct. App. 1995) ("In addition, the theory of negligent hiring does not apply because the uncontroverted evidence shows that decedent's employer was an independent contractor and not an employee of Lehman."); *Mason v. Gracey*, 375 S.E.2d 283, 287 (Ga. Ct. App. 1988) ("Therefore, where, as here, the facts establish that the one hired was an independent contractor, the plaintiff may not recover on a theory of negligent hiring.") Although Georgia does follow the *lex loci* choice of law rule for tort claims, *Bullard v. MRA Holding, LLC*, 740 S.E.2d 622,

625 (Ga. Ct. App. 2013), which should counsel in favor of applying Virginia law as the place where the tort was committed, Syfan would no doubt push to have Georgia law apply, and would be making that push in a jurisdiction amenable to the result of that argument. Thus, Plaintiff's choice of forum is entitled to even more weight given that the proposed alternative forum may not be an alternative at all.

**2. Convenience of and access to relevant witnesses counsels in favor of litigating this claim in Virginia.**

Syfan contends that the convenience of the witnesses counsels in favor of transferring this case to Syfan's backyard. Here, again, Syfan focuses only on itself, and even then does so incorrectly. Under Fourth Circuit case law, convenience of and access to the witnesses is a different consideration than the convenience of the parties. *Plumbers & Pipefitters Nat'l Pension Fund*, 791 F.3d at 444. Here, Syfan is a party, so its corporate designee and control group employees are properly considered as part of Syfan. Thus, the question is for which witnesses, aside from Syfan itself, would Georgia be a more convenient forum. The answer appears to be an empty set. The only witnesses in Georgia that would seem to be relevant to this case are the Syfan management personnel responsible for safety compliance and carrier hiring. Even if those individuals are considered as being separate from Syfan itself, that is still probably only two or three people, at most. And Ms. Turner's counsel will be happy to travel to Georgia to depose these witnesses.

The majority of the other witnesses are in Virginia. The law enforcement and medical personnel who responded to and investigated this crash—most importantly the Virginia State Police accident reconstruction team and the troopers who assisted with the prosecution of the DD

Logistics driver—are in Virginia.[4]  Ms. Turner and three of the other statutory beneficiaries are located in Virginia.  The DD Logistics driver who caused this wreck is currently in prison in Virginia for involuntary manslaughter.

Outside of these Virginia witnesses and the one or two Syfan witnesses in Georgia, the only other relevant witnesses are a statutory beneficiary in Pennsylvania and, perhaps, the DD Logistics management in Illinois.  For these witnesses, Virginia is no more or less convenient than Georgia.  And again, Plaintiff's counsel will happily travel to take the depositions of any such witnesses.  Thus, on balance, Virginia appears to be the more convenient forum for the majority of the witnesses in this case.  Stated differently, Georgia is certainly not so much more convenient to the witnesses that it should override Ms. Turner's choice of Virginia as the forum in which she litigates this claim.

> **3.     The convenience of the parties either counsels in favor of litigating in Virginia or, at worst, is a wash.**

The convenience of the parties is, at worst, a wash.  Just as Georgia is undoubtedly more convenient for Syfan, Virginia is undoubtedly more convenient for Ms. Turner.  But moving beyond that general stalemate, the balance begins to tip in favor of Virginia.  First, Syfan has indicated that it has litigation counsel in Georgia prepared to take over the defense of this case should the Court transfer it there.  (Docket No. 6-1 at 12.)  The same is not true for Ms. Turner.  Her counsel are not licensed in Georgia and have never appeared in Georgia.  Thus, to prosecute this claim in Georgia, she would have to retain local counsel, who would have to participate in

---

[4] In its brief, Syfan contends that "there are no witnesses to the collision to be interviewed or police officers to be called."  (Docket No. 6-1.)  Unless Syfan is willing to concede proximate causation in this case, this statement is unequivocally incorrect.  Stated differently, it is inconceivable that Syfan would concede that Plaintiff had satisfied her burden if she did not call anyone to describe how and why this wreck happened.

all proceedings in Georgia. Adding more lawyers to any mix never makes things more convenient for anyone. Second, Syfan boasts on its website of its national and international presence and reach, which seriously undercuts its claim that it would be horribly inconvenient to have to litigate this case in Virginia. For a company in the business of driving all over the country, going from Georgia to Virginia is not but so inconvenient. California, Montana, etc., perhaps, but not Virginia. But the same is not true for Ms. Turner. She is not involved in interstate trucking, and indeed rarely leaves the Shenandoah Valley in Virginia. She has a job. Having to travel to Georgia would be rather inconvenient for her. Thus, on Syfan's best day, the convenience of the parties inquiry is a wash, and more likely tilts in favor of litigating this case in Virginia.

4. **This case is about safety on the roadways of Virginia and a death that occurred in Virginia, so the interests of justice are best achieved by litigating this claim in Virginia.**

The final consideration is the interest of justice. Syfan says that the interests of justice would be best served by litigating this case in Georgia because, according to Syfan, this case is simply about a decision made in Georgia to hire an incompetent motor carrier. Thus, says Syfan, Georgia has the greatest interest in having this case litigated within its borders. Here again Syfan displays its inability to see forest for the trees. This case is not just about a decision made in Georgia. It is about the effects of that decision in Virginia. Syfan's decision to hire DD Logistics placed potentially thousands of Virginia drivers at risk as DD Logistics' driver drove up I-81 and then hit the back roads west of Harrisonburg. Syfan's decision to hire DD Logistics resulted in a massive wreck in Virginia, requiring the involvement of numerous Virginia first responders and clean-up crews. Finally, and most importantly, Syfan's decision to hire DD Logistics resulted in a woman being killed in Virginia while driving to work in Virginia, thereby

depriving four Virginia citizens of their mother.  This is a case about driving safety in Virginia, and a loss of human life in Virginia.  Virginia therefore has a very strong interest in having this case litigated here.  Thus, the interests of justice would best be served by retaining this case in Virginia.

In sum, Ms. Turner chose to file this suit in this Court in Virginia.  That decision was perfectly reasonably given that the tort occurred in Virginia, and this Court is indisputably a proper venue for litigating this claim.  The convenience of and access to the relevant witnesses counsels in favor of litigating this case in Virginia, as do the convenience of the parties and the interests of justice.  The Court should, therefore, deny Syfan's request to transfer this case to the Northern District of Georgia.

**C.     Ms. Turner's Complaint states a claim for which relief can be granted.**

Finally, Syfan contends that Plaintiff's Complaint fails to state a claim.  Syfan's argument appears to be based primarily upon a law that was recently passed, the FAST Act, that controls what information will be publicly available <u>going forward</u> about individual motor carriers.  How this legislation has anything to do with a claim that accrued more than one year before the legislation passed is puzzling, to say the least.  Thus, to consider whether Ms. Turner's Complaint states a claim, it is necessary first to properly frame the issue, and then address whatever it is Syfan is trying to say.

**1.     Negligent hiring of a dangerous motor carrier has been specifically recognized as a viable claim by this Court.**

Syfan is correct when it says that the doctrinal basis for Ms. Turner's claim is Restatement (Second) of Torts § 411.  Section 411 recognizes a defendant's "liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a

competent and careful contractor … to do work which will involve a risk of physical harm unless it is skillfully and carefully done."  In other words, in addition to liability for negligent hiring of an employee, you can also be held liable for negligent hiring of a contractor when the work in question involves a risk of physical harm unless it is skillfully and carefully done.  The purpose for this rule is obvious—to incentivize people to hire careful and skilled contractors instead of just taking the cheapest, lowest common denominator without regard to safety.  It prevents people and companies from farming all of their dirty work out to the cheapest, least qualified contractors and then insulating themselves from responsibility when the contractor they hired was not reasonably safe and skilled in the first place.

The Supreme Court of Virginia adopted § 411 in *Philip Morris v. Emerson*, 235 Va. 380 (1988).  Twenty years later, in *Jones v. C.H. Robinson Worldwide, Inc.*, 558 F. Supp. 2d 630 (W.D. Va. 2008), Judge Conrad held that the Supreme Court of Virginia would extend § 411 liability to the exact fact pattern at issue in this case, where a broker or third-party logistics provider hires an incompetent motor carrier to haul freight and the carrier ends up causing a wreck.  In *Jones*, the plaintiff was injured when a tractor trailer operated by AKJ Enterprises crossed the median and collided head-on with the plaintiff.  AKJ had been hired by C.H. Robinson Worldwide, Inc., "a Minnesota motor carrier broker with whom AKJ had a contractual relationship."  *Id.* at 634.  The plaintiff therefore sued C.H. Robinson on a theory of negligent hiring.

Judge Conrad first addressed whether this was even a viable claim.  After reviewing the history of § 411 liability in Virginia and in other jurisdictions that have adopted it, Judge Conrad ruled that "the Virginia Supreme Court would extend the cause of action of negligent hiring of an independent contractor to this situation involving the selection of a carrier by a freight broker or

third party logistics company such as Robinson." *Id.* at 642. He further ruled "that the operation of a tractor-trailer upon the public highways does involve such a risk of physical harm" for purposes of § 411 liability. *Id.* He thus concluded that the plaintiff's negligent hiring claim against C.H. Robinson was viable under the facts of that case, which are incredibly similar to the facts of this case.

Judge Conrad went on to address C.H. Robinson's arguments against liability. Everyone agreed that, like DD Logistics here, at the time of the wreck AKJ "was insured, [] had a conditional safety rating, and [] had valid operating authority from the FMCSA." *Id.* at 643. C.H. Robinson argued that once it had verified those three minimum requirements, that was enough, that C.H. Robinson had conducted adequate inquiry into the fitness of AKJ to haul interstate freight. *Id.*

The plaintiff disagreed. She contended that, just as DD Logistics had in this case, AKJ "had received a 'conditional' rating from the FMCSA" which "indicates that the FMCSA considers that the carrier does not have adequate safety management controls in place." *Id.* The plaintiff also pointed to the data available on the FMCSA website about AKJ, which—again, just like DD Logistics—included AKJ's presence in the bottom 10th percentile of various safety areas measured by the FMCSA and "that AKJ had previously been cited by the FMCSA for numerous violations of federal safety regulations." *Id.* at 643-44. On this basis, the plaintiff contended that "that Robinson was under a duty to ensure that it used reasonable care in selecting carriers; that it should have been alerted to safety problems with AKJ because of the carrier's conditional rating and the various incidents reported in the Express system; that in fulfilling its duty it should have checked the SEA scores that were publicly available on the FMCSA website; that those scores would have demonstrated that AKJ was a safety risk and would have resulted in

Robinson's refusal to hire AKJ for the subject load; and, finally, that Robinson's failure to properly investigate AKJ's poor safety record was the proximate cause of the accident in that its record would have indicated a high likelihood of a tractor-trailer crash such as the one that caused the plaintiff's injuries." *Id.* at 644.

In response, C.H. Robinson argued that the data and scores from the FMCSA website were "primarily intended to be an enforcement tool" and are not meant to be used for commercial or business purposes in deciding whether to hire a certain carrier. *Id.* at 645-46. Thus, C.H. Robinson essentially argued that the FMCSA scores and data, just like the FMCSA scores and data contained in the SAFER report for DD Logistics, were irrelevant and not properly considered in deciding whether it had been negligent in hiring AKJ.

Judge Conrad resolved these arguments by observing that C.H. Robinson "did hold itself out as a third party logistics provider in general and with regard to the subject load," "active[ly] interject[ed] itself into the relationship between shipper and carrier," and "cho[se] 'to do business in a context heavily tinged with the public interest.'" *Id.* at 646 (quoting *Schramm v. Foster*, 341 F. Supp. 2d 536, 553 (D. Md. 2004)). Thus, Judge Conrad held that "Robinson did have a duty to investigate the fitness of AKJ prior to hiring it to carry the subject load on the public highways." *Id.* Judge Conrad went on to reject C.H. Robinson's contention that, as a matter of law, it had adequately discharged this duty by verifying that AKJ was insured, licensed, and permitted to engage in interstate trucking by the FMCSA when he found that "the question of whether Robinson breached the appropriate duty of inquiry in selecting a competent carrier must be submitted to the jury." *Id.* at 647.

## 2. *Jones v. C.H. Robinson* **is directly on point and rejects many of the arguments that Syfan makes here.**

*Jones* is both factually and legally on all fours with Ms. Turner's claim.[5]  While DD Logistics may have been insured and authorized to engage in interstate trucking, it was "conditionally approved" by the FMCSA, (Ex. 1 at 3), which "indicates that the FMCSA considers that the carrier does not have adequate safety management controls in place." *Jones*, 558 F. Supp. 2d at 643.  Moreover, just like the carrier in *Jones*, the publicly available information about DD Logistics, of which Syfan either was aware or should have been aware, revealed a chronic inability to extricate itself from the bottom tenth percentile on critical safety metrics, such as driver safety and hours of service.  Moreover, the crash that killed Ms. Stever was caused or influenced by these very same factors—DD Logistics's driver engaging in unsafe, distracted driving and driving in excess of his hours of service allowance.  This Court held that the facts of *Jones* were sufficient to go to a jury on the questions of whether C.H. Robinson adequately discharged its duty of investigating the carrier before hiring it to carry the subject load and whether the carrier's poor safety record was a proximate cause of the plaintiff's injury.  Under substantially similar facts, Ms. Turner's Complaint certainly states a claim for negligent hiring against Syfan.

Syfan's 12(b)(6) argument is rather strange.  It does not dispute that negligent hiring of a contractor is a valid cause of action in Virginia or that it applies to a freight broker's hiring of an interstate motor carrier.  Nor does Syfan really contend that Plaintiff has failed to plausibly plead all of the requisite elements of the cause of action.  Instead, Syfan seems to be inviting the Court

---

[5] *Jones* was before Judge Conrad on cross-motions for summary judgment and motions in limine.  The parties had therefore had the opportunity to engage in fulsome discovery, as compared to the present posture of this case.  That said, the factual similarities are striking.

to basically rule, as a matter of law, that Syfan adequately discharged its duty to investigate DD Logistics before hiring it to carry this subject load. The Court should decline this invitation out of hand.

Two aspects of Syfan's argument seem to be identical to the argument that Judge Conrad rejected in *Jones*. Syfan (improperly going outside the allegations of Plaintiff's Complaint) first asserts that on the day of the wreck that killed Ms. Stever DD Logistics was "an authorized, insured, and licensed motor carrier by the FMCSA fit to operate in interstate commerce" and "possessed a valid interstate license, was not listed as unsatisfactory and had not been placed out of service by the FMCSA." (Docket No. 6-1 at 18.) As Judge Conrad ruled in *Jones*, Syfan is welcome to argue to the jury that doing the equivalent of checking to see if DD Logistics had a pulse was sufficient to discharge its duty of reasonable investigation, but that is a question of fact for a jury to decide. It cannot be decided as a matter of law, and certainly not on the basis of just the pleadings. Ms. Turner has alleged that Syfan failed to undertake a reasonable investigation of DD Logistics's competence, safety and skill, and that no reasonable broker would have hired DD Logistics had it engaged in such a reasonable investigation. Those allegations must be taken as true for present purposes, so Syfan's contention must be rejected here just as it was rejected in *Jones*.

Second, Syfan points to disclaimers on the FMCSA website that discuss how the yellow caution symbols should be interpreted and how a motor carrier is authorized to do business unless they have been deemed "unsatisfactory" by the FMCSA. (Docket No. 6-1 at 16-17.) The defendant in *Jones* pointed to similar disclaimers on the FMCSA website. 558 F. Supp. 2d at 645-46. Judge Conrad acknowledged these disclaimers, but agreed with the District of Maryland's opinion in *Schramm* that "a duty of further inquiry was implied where the carrier's

SafeStat scores were marginal, even though not unsatisfactory." *Id.* at 646. The same analysis applies here. Even though DD Logistics had not yet received an "unsatisfactory" rating, the presence of such atrocious BASIC scores prompted a duty of further inquiry on the part of Syfan.

### 3. The newly-enacted FAST Act does not affect the analysis at all.

The "new" piece to Syfan's position is its reliance upon the FAST Act. The FAST Act was signed into law by President Obama on December 4, 2015, and deals with a whole host of issues in the interstate trucking and surface transportation arena. Syfan relies upon an aspect of the FAST Act that calls for the removal of the BASIC scores and percentiles from the FMCSA website pending further study. First, this aspect of the FAST Act is prospective in nature, going into effect "1 day after the date of enactment of this Act." (Docket No. 6-1 at 14 (citing § 5223 of the Surface Transportation Reauthorization and Reform Act).) Thus, it has absolutely nothing to do with the state of affairs more than one year previously, on November 13, 2014, when Ms. Stever was killed. The analysis of the impact of the FAST Act on this case can and should end there.

Nevertheless, Syfan extrapolates from the FAST Act's prospective removal of the BASIC scores from public view that "reliance upon this data and/or symbols has been determined to be flawed given that overnight all such data was immediately removed from the FMCSA website relating to each and every motor carrier operating in the United States" and that the "FAST Act confirms that the FMCSA's CSA website BASIC Scores and data reports are flawed and unreliable." (Docket No. 6-1 at 16-17 (<u>citing absolutely nothing</u>).) Two points in response to Syfan's extrapolation. First, Syfan seeks too much mileage from the FAST Act. The FAST Act is a response to industry complaints that the BASIC and SAFER scores are misleading, unfair, bad for business, etc. The FAST Act thus says, essentially, "ok, let's look at that, see if it is

valid, see if there is a better way to present this information." The Act unequivocally does not say, as a matter of law, that the data or scores contained in the BASIC or SAFER reports are unreliable, incorrect, or anything of the sort.

Second, and more important, Syfan's argument misses the point. The point of these BASIC and SAFER scores is that, at all times relevant to this action, they were publicly available sources of information that, at the very least, would put a reasonable person on notice that there are things to be concerned about for this particular motor carrier. Perhaps a reasonable company in Syfan's position would see the awful BASIC scores, rely on them and stop right there, concluding that it just is not worth the risk to do business with this company. Or perhaps a reasonable company in Syfan's position is skeptical of the validity of the BASIC scores, and so decides to dig deeper and look at the data behind the scores to determine if this is a company worth doing business with. Either way, the publicly available information puts anyone who is interested in learning about a given carrier, such as DD Logistics, on notice that there is reason to pause and consider before hiring that carrier. And here, Plaintiff's allegations are that had Syfan reasonably paused to investigate DD Logistics, they could not reasonably have believed that DD Logistics was a proper hire.

Moreover, even if Syfan is of the opinion that the scoring methodology underlying the BASIC scores is flawed, the fact remains that the data underlying those scores—all of which is also publicly available—is objective data not subject to interpretation. The instances of a carrier's drivers driving in violation of the hours of service regulations themselves are verifiable fact, even if you believe that the hours of service percentile score that FMCSA assigns as a result of those instances is somehow improper. The instances of a carrier's drivers violating the driving laws and engaging in unsafe driving themselves are verifiable fact, even if you are of the

opinion that the unsafe driving percentile score the FMCSA assigns as a result of those instances is somehow improper. There is no suggestion that the FMCSA is just fabricating the underlying data out of whole cloth. Even if one chooses to believe that a bad FMCSA score is itself not proof of fire, it is certainly notice of smoke. The question is then how a reasonable broker in Syfan's position would respond to this smoke. That is the question of fact presented in this case. This case does not simply turn on the truth, reliability, fairness or anything else about the BASIC scores themselves. Instead, it turns on how a reasonable company in Syfan's position would interpret and respond to those scores.

## CONCLUSION

Companies like Syfan create the market for unsafe companies like DD Logistics. If companies like Syfan act reasonably in investigating and screening who they hire, companies like DD Logistics would be forced to either change their ways our go out of business. Syfan failed to act reasonably here, despite having easy access to information that would cause any reasonable person to think twice before hiring DD Logistics. Syfan thus commissioned DD Logistics to haul time-sensitive freight from one place to another, knowing and expecting that DD Logistics would drive that freight through Virginia. As a result of that commission, Ms. Stever suffered a tragic death in Virginia. Virginia therefore has personal jurisdiction over Syfan, and is a proper forum in which to litigate this claim. Moreover, Ms. Turner's Complaint sets forth voluminous, plausible allegations in support of her negligent hiring claim, which has been explicitly recognized by this Court as a valid claim under very similar facts. Syfan's motion should, therefore, be denied. Alternatively, should the Court have any question about the jurisdictional question, Plaintiff should be granted leave to conduct discovery in aid of jurisdiction.

Respectfully submitted,

REBECCA LYNN TURNER,
Administrator of the Estate of
CONNIE SUE WOMACK STEVER, Deceased,

By Counsel

_____/s/ E. Kyle McNew_____
E. Kyle McNew, Esquire (VSB No. 73210)
J. Gregory Webb, Esquire (VSB No. 38157)
MICHIE HAMLETT LOWRY
  RASMUSSEN & TWEEL PLLC
500 Court Square, Suite 300
Post Office Box 298
Charlottesville, Virginia 22902
(434) 951-7200; (434) 951-7218 Facsimile
gwebb@michiehamlett.com
kmcnew@michiehamlett.com

*Counsel for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

     I hereby certify that on this 8th day of January, 2015, I field the foregoing using the Court's CM/ECF electronic filing system, which will cause a Notice of Electronic Filing to be sent to all counsel of record.

       /s/ E. Kyle McNew        
