**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**HARRISONBURG DIVISION**

| | | |
|---|---|---|
| **REBECCA LYNN TURNER,** | ) | |
| *Administrator for the Estate of* | ) | |
| *Connie Sue Womack Stever, Deceased,* | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 5:15cv81** |
| **v.** | ) | |
| | ) | |
| **SYFAN LOGISTICS, INC.,** | ) | By:  **Michael F. Urbanski** |
| | ) | **United States District Judge** |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION</u>**

This wrongful death action, alleging negligent hiring and retention, is brought by plaintiff

Rebecca Lynn Turner, Administrator of the Estate of Connie Sue Womack Stever, Deceased,

("Turner") against defendant Syfan Logistics, Inc. ("Syfan").  The dispute arises out of Syfan's hiring

of DD Logistics, Inc. ("DD") to haul a load of frozen chicken from Chattanooga, Tennessee to

Moorefield, West Virginia, and a subsequent motor vehicle accident that killed Connie Sue Womack

Stever.  Presently pending before the court are Syfan's Fed. R. Civ. P. 12(b)(2) motion to dismiss for

lack of personal jurisdiction and Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a

claim.  Alternatively, Syfan moves to transfer this case to the Gainesville Division of the Northern

District of Georgia.

**I.**

On November 22, 2014, Connie Stever was killed in a motor vehicle accident on Route 259

in Rockingham County, Virginia.  ECF No. 1, ¶ 2.  Stever's vehicle collided with a tractor trailer

truck driven by James Patterson ("Patterson"), an employee of DD.  Id. at ¶¶ 12, 18-21.  Patterson

has an extensive criminal history and could not lawfully operate a tractor trailer in Virginia.  Id. at ¶¶

10, 13.  Further, Turner alleges Patterson had been driving for more than 11 consecutive hours in

violation of 49 C.F.R. § 395.3, and unlawfully possessed oxycontin at the time of the crash. Id. at ¶ 14. As Patterson travelled down Route 259, a curvy, two lane road, Patterson was distracted by his phone or GPS system. Id. at ¶¶ 15-16. As Patterson approached a curve in the road to the right, he crossed the yellow line into oncoming traffic. Id. at ¶ 17. Patterson drove through oncoming traffic into a yard, where he hit a tree. Id. at ¶¶ 17-18. After hitting the tree, Patterson veered back into oncoming traffic. Id. at ¶ 18. As Patterson re-entered the roadway, his tractor trailer flipped on its side, onto Stever's vehicle and then slid 100 feet down the road with Stever underneath it. Id. at ¶ 20. Stever died before assistance arrived. Id. at ¶ 21. Turner's claim against DD and Patterson was settled pursuant to a state court action to which Syfan was not a party. ECF No. 6–3.

Turner alleges that Syfan is liable for negligently hiring and retaining DD. ECF No. 1, ¶¶ 30-37. Syfan is an interstate property broker that regularly arranges the interstate transport of goods. Syfan Aff., ECF No. 6–5, ¶ 3. Pilgrim's Pride hired Syfan to manage its shipping needs, in this case to transport frozen chicken from Tennessee to West Viriginia. ECF No. 1, ¶¶ 22-23. Syfan is a Georgia corporation with its sole place of business in Gainesville, Georgia. ECF No. 6–5, ¶ 4. Syfan maintains no employees, offices, bank accounts, physical assets, or real property in Virginia. Id. at ¶¶ 5-7. The decision to retain DD to transport the shipment occurred in Gainesville, Georgia, and Syfan personnel and documents involved in the retention of DD are in Gainesville, Georgia. Id. at ¶¶ 8 -10. Syfan claims to have maintained no control over the methods, means, or details of the transportation. Id. at ¶ 12.

The Load Confirmation memorializes the shipping agreement between Syfan and DD and lists the distance of travel as 527 miles.[1] ECF No. 11–5. The Load Confirmation is dated

---

[1]    Syfan argues that payment by Syfan to DD was conditioned only on the timely delivery of the load to Moorefield, West Virginia, rather than delivery by way of any particular route. ECF No. 18, 3. The Load Confirmation document that memorializes the agreement between Syfan and DD includes a line reading "Miles: 527.0." Though DD's payment may not have been conditioned on taking a 527 mile route, the Load Confirmation, at a minimum, indicates Syfan anticipated that a route of 527 miles would be taken by DD. A route of such length aligns with the two

November 12, 2014, and stipulated that pickup of the frozen chicken in Chattanooga, Tennessee was to occur on the same day. Id. The Load Confirmation required delivery to Moorefield, West Virginia on November 13, 2014. Id.

Turner bases her claim on information that was available to Syfan in November 2014 through the Federal Motor Carrier Safety Administration ("FMCSA") website, which contains safety data and ratings regarding interstate shipping companies. ECF No. 1, ¶¶ 8-9. In Turner's view, the site provided data and ratings that indicated DD was an unsafe motor carrier. Id. The FMCSA website showed DD had numerous unsatisfactory reports and critical violations. Id. DD, for example, ranked in the fourth percentile for driving safety and bottom ten percent for hours of service compliance. Id. Turner cites additional FMCSA data suggesting that DD's grades for safety have been very low since 2012. Id. This information about DD was readily available on the FMCSA website at the time Syfan hired DD. Id.

The government has recently addressed safety violation information contained on the FMCSA website. ECF No. 6–1, 15-18. Syfan cites enactment of the "FAST Act" and a disclaimer on the FMCSA website to cast doubt on the reliability of the data and analysis on the FMCSA website. Id. at 17-18; ECF No 12, 17.

## II.

When a court considers "a question of personal jurisdiction based on the contents of a complaint and supporting affidavits, the plaintiff has the burden of making a prima facie showing in support of its assertion of jurisdiction." Universal Leather, LLC v. Koro AR, S.A., 773 F. 3d 553, 558 (4th Cir. 2014) (citing Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 276 (4th Cir. 2009)). In determining if a plaintiff has met this burden, a court "must construe all relevant pleading

---

most direct routes from Chattanooga, Tennessee to Moorefield, West Virginia, both of which require substantial travel through Virginia. The quickest route requires travel up the I-81 corridor to Harrisonburg, before heading west through Rockingham County toward Moorefield, West Virginia. Patterson appears to have been travelling exactly such a route when his truck struck Stever's vehicle.

allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Id. (quoting Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)).

Before exercising personal jurisdiction over a non-resident defendant, a court must find that two conditions are satisfied. First, the state's long-arm statute must authorize exercise of jurisdiction in the circumstances presented. Second, the exercise of jurisdiction must comport with Fourteenth Amendment due process standards. Ellicott Mach. Corp., Inc. v. John Holland Party Ltd., 995 F.2d 474, 477 (4th Cir. 1993). The Fourth Circuit has interpreted Virginia's long-arm statute, Virginia Code § 8.01–328.1, as coextensive with the Due Process Clause. English & Smith v. Metzger, 901 F.2d 36, 38 (4th Cir. 1990)(citing Peanut Corp. of Am. V. Hollywood Brands, Inc., 696 F.2d 311, 313 (4th Cir. 1982)). Because Virginia's long-arm statute extends personal jurisdiction to the outer bounds of due process, the two-prong test collapses into a single inquiry when assessing personal jurisdiction in Virginia.

> Fairness is the touchstone of the jurisdictional inquiry, and the 'minimum contacts' test is premised on the concept that a corporation that enjoys the privilege of conducting business within a state bears the reciprocal obligation of answering to legal proceedings there. In the context of specific jurisdiction, the relevant conduct must have only such a connection with the forum state that it is fair for the defendant to defend itself in that state. We do more than formulaically count contacts, instead taking into account the qualitative nature of each of the defendant's connections to the forum state. In that vein, a single act by a defendant can be sufficient to satisfy the necessary quality and nature of such minimal contacts, although casual or isolated contacts are insufficient to trigger an obligation to litigate in the forum.

Tire Eng'g v. Shandong Linglong Rubber Co., 682 F.3d 292, 301 (4th Cir. 2012)(internal quotations and citations omitted).

The question, then, is whether defendant has sufficient "minimum contacts with [Virginia] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial

justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).  The "minimum contacts" test requires that defendants purposefully avail themselves of the forum state.  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985).  This test aims to ensure defendants are not "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts," id., and affords defendants protection "from having to defend [themselves] in a forum where [they] should not have anticipated being sued."  Consulting Eng'rs, 561 F.3d at 277 (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).

Determining the reach of judicial power over persons outside of a state's borders under the International Shoe standard is undertaken through consideration of two categories of personal jurisdiction—general and specific.  Daimler AG v. Bauman, 134 S. Ct. 746, 754 (2014).  General jurisdiction requires a substantial connection to the forum; the defendant's contacts must be so continuous and systematic as to render him essentially "at home."  Id. at 754, 760 (citing Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851–54 (2011)).  Specific jurisdiction exists in a suit arising out of or related to the defendant's contacts with the forum.  Id. at 754.

## A.

Turner has not shown that Virginia maintains general jurisdiction over Syfan.  General jurisdiction is proper when a corporation's "'affiliations with the [forum] State are so 'continuous and systematic' as to render [it] essentially at home in the forum State.'"  Daimler, 134 S. Ct. at 761 (quoting Goodyear, 131 S. Ct. at 2851).  The paradigm bases of general jurisdiction are a corporation's principal place of business and place of incorporation.  Id. at 760.  In an "exceptional case . . . a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State"  Id. at 761 n.19.

Turner has not alleged facts indicating that Syfan is "at home" in Virginia. Syfan is a Georgia corporation and its principal place of business is in Georgia. ECF No. 6–5, ¶ 4. Syfan maintains no constant physical presence in Virginia. Id. at ¶ 6. Turner generally argues that Syfan may arrange for shipment of goods through Virginia on a regular basis. ECF No. 11, pgs. 15-16. Even assuming such suspicions are true, they do not arise to a continuous and systematic presence in Virginia. Even before Daimler, general jurisdiction often turned on whether a defendant was physically present in the forum state. See ESAB Group v. Centricut, Inc., 126 F.3d 617, 624 (4th Cir. 1997). After Daimler, "it is incredibly difficult to establish general jurisdiction in a forum other than the place of incorporation or principal place of business." Monkton Ins. Servs., Ltd. v. Ritter, 768 F.3d 429, 432 (5th Cir. 2014). Daimler found general jurisdiction improper even though the defendant had "multiple California-based facilities" and was the "largest supplier of luxury vehicles to the California market." 134 S. Ct. at 761-62. Here, Syfan's contacts with Virginia are less significant than those of the defendant in Daimler, affording no basis for the exercise of general jurisdiction over it.

**B.**

The issue of specific jurisdiction over Syfan is a closer one. In assessing specific jurisdiction, courts employ a three-part test to determine whether the exercise of specific jurisdiction over a nonresident defendant comports with the requirements of due process. Courts evaluate "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims arise out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable." Universal Leather, 773 F.3d at 559 (quoting Tire Eng'g, 682 F.3d at 301-02).

The first part of the test— purposeful availment— embodies International Shoe's minimum contacts requirement. The purposeful availment inquiry is grounded on the traditional due process

concept of minimum contacts, which embodies the premise that "a corporation that enjoys the privilege of conducting business within a state bears the reciprocal obligation of answering to legal proceedings there." Tire Eng'g, 682 F.3d at 301 (internal quotations and citations omitted); see Int'l Shoe Co., 326 U.S. at 320 (examining whether the defendant has "establish[ed] sufficient contacts or ties with the state of the forum to make it reasonable and just according to our traditional conception of fair play and substantial justice to permit the state to enforce the obligations which [the defendant] has incurred there"). Thus, in determining whether a foreign defendant has purposefully availed itself of the privilege of conducting business in a forum state, courts look to whether "the defendant's conduct and connection with the forum [s]tate are such that he should reasonably anticipate being haled into court there." Fed. Ins. Co. v. Lake Shore Inc., 886 F.2d 654, 658 (4th Cir. 1989) (quoting World–Wide Volkswagen, 444 U.S. at 297) (internal quotations omitted).

The purposeful availment analysis is flexible and depends on a number of nonexclusive factors that courts consider on a case-by-case basis. Consulting Eng'rs, 561 F.3d at 278. Those factors include, but are not limited to, an evaluation of:

> (1) whether the defendant maintains offices or agents in the forum state;
>
> (2) whether the defendant owns property in the forum state;
>
> (3) whether the parties contractually agreed that the law of the forum state would apply;
>
> (4) whether the defendant made in person contact with a resident of the forum in the forum state regarding the business relationship;
>
> (5) whether the defendant reached into the forum state to solicit or initiate business;

(6) whether the defendant deliberately engaged in significant or long

term business activities in the forum state;

(7) the nature, quality and extent of the parties' communications

about the business being transacted; and

(8) whether the performance of the contractual duties was to occur

within the forum.

Fed. Ins. Co., 886 F.2d at 658 (internal citations omitted).

Syfan (1) maintains no offices or agents in Virginia, (2) owns no property in Virginia, (3) did not contractually agree that the laws of Virginia would apply, (4) made no in person contact with a Virginia resident regarding the business relationship, (5) did not reach into Virginia to initiate or solicit business and (6) did not deliberately engage in significant or long term business activity in Virginia. Therefore, the first six factors provide no basis for jurisdiction.

The seventh factor looks to the nature, quality, and extent of the Syfan's communications regarding the business being transacted. The court looks to the "contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine whether Syfan "purposefully established minimum contacts within the forum." Burger King, 471 U.S. at 478. Though the quantity of communication between DD and Syfan is unclear, Turner provides a copy of the Load Confirmation that memorializes at least some of the agreement between DD and Syfan. ECF No. 11–5. The Load Confirmation obligated DD to drive to Moorefield, West Virginia within a day of picking up the load from Chattanooga, Tennessee. Id. The mileage listed on the Load Confirmation, a document drafted by Syfan, anticipates a route of 527 miles. Id. Such a route aligns closely with the two quickest routes from Chattanooga, Tennessee to Moorefield, West Virginia, both of which require transportation through Virginia. ECF No. 11–4. The quickest route, the same route that Patterson appears to have taken, requires travel up the Interstate 81

corridor from the Virginia-Tennessee border to Harrisonburg, Virginia before heading west on Route 259 to Moorefield, West Virginia.  Id.  As such, Syfan purposefully targeted Virginia as a state through which DD would transport the load.

The nature of this behavior goes well beyond mere foreseeability that a mobile product may end up in a foreign jurisdiction.  See World Wide-Volkswagen, 444 U.S. at 297.  Syfan did not, for example, manufacture a tractor-trailer that travelled through Virginia as a result of the unilateral actions of a DD.  Rather, Syfan hired DD to haul a load, contemplating a route that required travel through Virginia.  The "contemplated future consequence" of Syfan's action is that DD would haul a load through Virginia en route to Moorefield, West Virginia.  Burger King, 471 U.S. at 479.  Thus, the eighth factor, too, favors assertion of jurisdiction over Syfan as DD's performance of these contractual duties was to occur in Virginia.

Further, as an interstate trucking broker, Syfan engages in the business of arranging for interstate shipments regularly.  See Brandi v. Belger, 842 F. Supp. 1337, 1342 (D. Kan. 1994).  It can come as no surprise to Syfan that litigation in Virginia might ensue when Syfan's conduct ensured DD would haul a load of frozen chicken across a significant portion of the state. [2]  The nature of the communication between DD and Syfan, though not extensive, led to a clear understanding that DD would travel through Virginia to deliver the load to West Virginia.  In sum, analysis of the factors indicates that Syfan is subject to specific jurisdiction in Virginia.

---

[2]     Personal jurisdiction inquiries are fact intensive and include analysis of the type of business in which the defendant is engaged.  The Fifth Circuit Court of Appeals has noted:

> In view of the nature of the business of brokering interstate trucking services, it is hardly surprising that the defendant's contacts with any single jurisdiction are comparatively fleeting and slight.  We conclude that it is both reasonable and just to require lesser forum contacts of a non-resident defendant in the context of the present facts than have been found necessary to sustain jurisdiction over defendants whose activities have, both generally and with respect to the transaction giving rise to the controversy, a more purely local character.

Mississippi Interstate Exp. v. Transpo, 681 F.2d 1003, 1010 (5th Cir. 1982).

Brandi provides jurisdictional facts almost identical to those in the present case and holds that "[k]nowingly arranging for the transport of goods through [a] state" arises to purposeful availment in that state. 842 F. Supp. at 1342. In Brandi, plaintiff hired Professional, an interstate shipping broker, to arrange for the shipment of office furniture from Missouri to Colorado. Id. at 1339-1341. Professional hired Valley Transportation and Warehouse Inc. to haul the furniture. Id. En route to Colorado, the furniture was damaged in Kansas. Id. Professional was a Colorado corporation with its principal place of business in Colorado. Id. Though Professional had occasionally arranged for the shipments of goods to, from, and through the state of Kansas, Professional had no office in Kansas, was not authorized to do business in Kansas, and did not advertise in Kansas. Id. Because Professional failed to secure proper insurance on the freight, plaintiff sued it in a diversity action in Kansas federal court. Id. Professional moved for dismissal, arguing that the Kansas court lacked personal jurisdiction over them.

"Because the court [did] not know the extent to which Professional arranged for the shipment of goods to, from, and through Kansas on occasions other than that involved in the present case," the court found Professional's contracting to ship goods from Kansas City, Missouri to Colorado provided the only relevant jurisdictional conduct. Id. at 1341. The court explained that as an interstate shipping broker, Professional "must have been aware that goods being transported from Kansas City, Missouri to Colorado would travel through Kansas en route" and "should certainly have foreseen the possibility of litigation arising in a state through which it had arranged for the shipment of goods." Id. at 1341-42. The court emphasized that interstate shipping brokers are particularly well-positioned to foresee litigation in states through which they arrange for the shipment of goods. Id. at 1342 (citing Mississippi Interstate Exp., 681 F.2d at 1010.)

Like Brandi, the relevant jurisdictional conduct in the present case involves Syfan's hiring of a third party to haul goods through Virginia. Syfan surely knew that goods shipped from

10

Chattanooga, Tennesee to Moorefield, West Virginia would travel through Virginia en route. Indeed, Syfan's contact to Virginia is stronger than that of Professional to Kansas as the Load Confirmation included a route length that plainly anticipates travel through much of Virginia. ECF No. 11–5. Like Professional, Syfan is an interstate shipping broker well-equipped to predict that a motor vehicle accident might occur in a state through which it hired a company to haul goods. Just as in <u>Brandi</u>, this court will not immunize an interstate transportation broker from litigation in a state through which it arranged for the transport of goods. 842 F. Supp at 1342.

Syfan argues that <u>Walden v. Fiore</u>, 134 S. Ct. 1115 (2014), prohibits this court from asserting personal jurisdiction over Syfan. In <u>Walden</u>, petitioner, a DEA agent, seized $97,000 in cash from respondents, alleged gamblers, at the Hartfield-Jackson Airport in Atlanta. <u>Id.</u> at 1119. Petitioner had information that respondents accumulated the $97,000 at a casino in San Juan, Puerto Rico and knew they were flying to and had a residence in Nevada. <u>Id.</u> Respondents' Nevada counsel contacted the DEA agent on multiple occasions, and eventually filed suit in Nevada federal court. <u>Id.</u>

The Supreme Court explained that petitioner's mere knowledge of respondent's connections to Nevada did not give rise to minimum contacts with Nevada. <u>Id</u>. at 1124-25. Petitioner's behavior related to the suit in no way compelled the respondents to travel to Nevada. <u>Id</u>. at 1125-26. Rather, the respondents' connection to Nevada existed independently of petitioner's conduct. <u>Id.</u> A finding of personal jurisdiction would have "improperly attribute[d] a plaintiff's forum connections to the defendant and ma[de] those connections decisive in the jurisdictional analysis." <u>Id</u>. at 1125.

Unlike the DEA agent in <u>Walden</u>, Syfan plainly contemplated that the DD truck would travel through Virginia. Syfan argues that DD unilaterally chose to carry the load through Virginia.

By means of the Load Confirmation, Syfan anticipated that DD would travel through Virginia. By effectively plotting the route through Virginia, Syfan created a nexus to Virginia.

Syfan also relies on Swift Trans. Co. v. RTL Enterprise, No. 1:14-cv-902, 2015 WL 457641 (N.D.N.Y. February 3, 2015), but that case is distinguishable. In Swift, defendant East Coast Systems Engineering, Inc. ("East Coast") hired Swift Transportation Co. ("STC") to transport containers of asbestos from Connecticut to Ohio. Id. at * 1. East Coast hired defendant RTL Enterprises ("RTL") to load the containers of asbestos onto trailers that STC would pick up and haul. Id. On two occasions, shortly after picking up the trailers from RTL's facility, drivers working for STC noticed that the asbestos containers were leaking liquid. Id. On both occasions, STC noticed the leaking asbestos containers at a travel center in Newbaugh, New York. Id. STC sought damages related to costs incurred in cleaning up the asbestos spills in New York federal court. Id. Syfan relies on Swift's holding that neither STC nor RTL's conduct subjected them to personal jurisdiction in New York. Syfan's reliance is misplaced as neither STC nor RTL are similarly situated to Syfan in the present case.

RTL only loaded the asbestos containers and played no role in determining the destination of the asbestos. Id. East Coast hired STC to drive a route from Connecticut to Ohio, a route that likely involved travel through New York. Id. at *4. However, unlike Syfan and Professional in Brandi, nothing in Swift suggests that East Coast regularly engages in interstate brokerage services. Id. Therefore, nothing in Swift shows East Coast is well-positioned to anticipate the route the asbestos barrels would take or that litigation could ensue as a result of the goods travelling a particular route. Instead, East Coast and RTL were only "tangentially involved in the overall transportation of the asbestos to its ultimate disposal site in Ohio" and there was "no evidence, or even an allegation, that either defendant took any affirmative act to target New York." Id. The same cannot be said for Syfan, whose business revolves around brokering the interstate

transportation of goods.  Syfan Aff., ECF No. 6–5, ¶ 3.  Here Syfan's role was to arrange

transportation of frozen chicken from Tennessee to West Virginia.  In so doing, Syfan targeted

Virginia as the Load Confirmation contemplates a route that requires travel through Virginia.  ECF

No. 11–5.  In sum, Syfan's business and its conduct in arranging for the shipment of goods differ

significantly from that of the <u>Swift</u> defendants.

Nor does <u>Chung v. NANA Development Corp.</u>, 783 F.2d 1124 (4th Cir. 1986), suggest that

Syfan did not purposefully avail itself of jurisdiction in Virginia.  In <u>Chung</u>, a Virginia plaintiff

contacted NANA, an Alaskan business, and arranged to travel to Alaska to purchase 500 pounds of

frozen reindeer antlers.  <u>Id.</u> at 1125-26.  NANA's business did not involve shipment of reindeer

antlers throughout the U.S.  Instead, NANA only sold reindeer antlers to customers in Alaska and

Asia.  <u>Id</u>. at 1128.  Though the parties agreed that plaintiff could pick up his entire order when he

travelled to Alaska, he was only able to pick up a portion of the frozen reindeer antlers.  <u>Id.</u> at 1126.

As a result, NANA agreed to ship the remaining portion of antlers to plaintiff.  <u>Id.</u>  Though the

court noted that a single transaction can give rise to personal jurisdiction, NANA's mere knowledge

that it was sending goods to Virginia at its customer's request did not rise to purposeful availment.

<u>Id.</u> at 1127-28.  Importantly, NANA desired to transact business only in Alaska and made no

affirmative efforts to engage in interstate trade.  The court explained:

> While it is only fair that a corporation seeking to create interstate
> business by its own endeavors be subject to suit wherever it extends
> its reach, as the "contacts proximately result from actions by the
> defendant himself," <u>Burger King</u>, 105 S. Ct. at 2184 (emphasis in
> original), it is equally necessary to protect an enterprise such as
> NANA which has not made such efforts, but only sells its product to
> direct purchasers in its home state.

<u>Id.</u> at 1128.

Thus, <u>Chung</u> teaches that whether the defendant initiated contact with the goal of

commercial benefit is material in gleaning whether that defendant is subject to personal jurisdiction

in the forum.  <u>Id.</u>  For that reason alone, Syfan's circumstances differ materially from those of

NANA. Syfan sought to create "interstate business" by soliciting DD to haul the load requiring travel through Virginia. Further, unlike NANA, Syfan regularly engages in the interstate transportation of goods. Syfan solicited DD on its own accord to transport goods that Syfan anticipated would require extensive travel along Virginia's roadways. Unlike NANA, Syfan should have reasonably anticipated its actions could lead to litigation in Virginia.

As to the second portion of the specific jurisdiction test, the court must assess whether Turner's claims arose out of Syfan's acts directed at Virginia. Universal Leather, 773 F.3d at 559. The accident that killed Stever arose from Syfan's hiring of DD to haul chicken through Virginia. As such, Syfan's conduct directed at Virginia gave rise to Turner's cause of action, and the second part of the minimum contacts test is satisfied.

The third part of the minimum contacts test gleans whether the exercise of personal jurisdiction is constitutionally reasonable. Id. Courts employ five factors to determine if exercising personal jurisdiction is constitutionally reasonable: (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies. Asahi Metal Indus. Co. v. Superior Court of Cal., 480 U.S. 102, 113 (1987) (citing World-Wide Volkswagen, 444 U.S. at 292).

Syfan's lack of offices and employees in Virginia does not render jurisdiction unreasonable. Though based in Georgia, Syfan is a nationwide brokerage business that is well-equipped to handle litigation in Virginia. Syfan has retained counsel in Virginia. To the extent causation and the accident itself are at issue, the relevant witnesses and other discoverable materials are in Virginia. Patterson, the driver as of the DD truck, is incarcerated in Virginia for involuntary manslaughter. ECF No. 11, at 19. As such, litigating in Virginia would not be "so gravely difficult and

14

inconvenient" that it places Syfan at a "severe disadvantage." Christian Science Bd. of Dir. v. Nolan,

259 F.3d 209, 217 (4th Cir. 2001); cf. Asahi Metal Indus., 480 U.S. at 114. (finding an

unconstitutional burden where the defendant would be forced to travel from Japan and litigate in a

foreign judicial system.) Plainly, Virginia has an interest in the resolution of disputes related to

motor vehicle deaths on Virginia roadways. Additionally, four of Stever's statutory beneficiaries

reside in Virginia. ECF No. 11, 19. In short, the court concludes that the exercise of specific

personal jurisdiction over Syfan comports with "traditional notions of fair play and substantial

justice." Int'l Shoe Co., 326 U.S. at 316.

In sum, Syfan hired a trucking company to drive through Virginia en route to Moorefield,

West Virginia. In doing so, Syfan extended its reach into Virginia for the purpose of conducting

interstate business, satisfying both the Virginia long-arm statute and constitutional due process. As

such, Syfan's 12(b)(2) motion to dismiss for lack of personal jurisdiction is **DENIED**.

### III.

Syfan moves for a transfer of venue to the Northern District of Georgia pursuant to 28

U.S.C. § 1404(a). § 1404(a) reads:

> For the convenience of parties and witnesses, in the interest of
> justice, a district court may transfer any civil action to any other
> district or division where it might have been brought or to any
> district or division to which all parties have consented.

The statute provides the court discretion to transfer cases based on individualized considerations of

convenience and fairness. Stewart Organization v. Rich Corp., 487 U.S. 22, 29 (1988). In deciding

whether to transfer, the court must consider: (1) the weight accorded to plaintiff's choice of venue;

(2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice.

Trs. of the Plumbers v. Plumbing Services, 791 F.3d 436, 444 (4th Cir. 2015). "[P]laintiff's 'choice

of venue is entitled to substantial weight in determining whether transfer is appropriate.'" Id.

(quoting Bd. of Trs. v. Sullivant Ave. Props., LLC, 508 F. Supp. 2d 852, 856-57 (D. Md. 2005)). A

motion to transfer must be denied were it merely shifts the inconvenience of litigation from the defendant to the plaintiff.  AFA Enterprises, Inc. v. American States Ins. Co., 842 F. Supp. 902, 909 (S.D.W.V. 1994)(citing Van Dusen v. Barrack, 376 U.S. 612, 645-46 (1964), Uniprop Mfd. Housing Commun. Income Fund v. Home Owners Funding Corp of Am., 753 F. Supp. 1315, 1322 (W.D.N.C. 1990)); see also Verizon Online Serv's v. Ralsky, 203 F. Supp. 2d 601, 623-24 (E.D.Va. 2002)("[A] plaintiff's choice of forum is entitled to 'substantial weight,' unless the plaintiff chooses a foreign forum and the cause of action bears little relation to the chosen forum.")(internal citations omitted).

Turner's choice holds significant weight as the wreck occurred in Virginia, Turner and three other statutory beneficiaries reside in Virginia, and a number of key witnesses, including Patterson and first responders to the wreck, are in Virginia.  Verizon Online Serv's, 203 F. Supp. 2d at 623-24. Accordingly, the court affords substantial weight to Turner's choice of venue and will only transfer to the Gainesville Division of the Northern District of Georgia if the remaining factors strongly favor doing so.

The convenience and access of the witnesses do not weigh in favor of transfer to Georgia. Patterson is currently jailed in Virginia for charges relating to Stever's death, and first responders who were present at the scene of the wreck reside in Virginia.  Though Turner's counsel may have to travel to Georgia for discovery, Syfan's counsel would likely need to travel to Virginia for discovery were this case to be litigated in the Northern District of Georgia.  As for potential witnesses not located in Georgia or Virginia, travel to Gainesville, Georgia is not significantly less onerous than travel to Harrisonburg, Virginia.[3]

---

[3]     Syfan argues that potential witnesses, such as DD employees in Illinois, and others involved in this lawsuit will find travel to the Gainesville Division of the Northern District of Georgia easier than to the Harrisonburg Division of the Western District of Virginia, given Gainesville's proximity to Atlanta, Georgia.  ECF No. 6, at 12. The Western District of Virginia is home to multiple commercial airports within an hour or two of Harrisonburg, including airports in Charlottesville, Lynchburg and Roanoke.  See Virginia Airports, Virginia Department of Aviation, (2012),

Similarly, the convenience to the parties does not strongly favor the Northern District of Georgia over Harrisonburg, Virginia. Obviously, Syfan prefers to litigate in its home venue in Georgia. However, any increase in convenience to Syfan is offset by a corresponding inconvenience to Turner. Defendant's attempt to "shift the inconvenience from the defendant to the plaintiff" does not justify a change in jurisdiction. AFA, 842 F. Supp at 909. Syfan engages in business throughout the country and has retained counsel in Virginia, leaving it well-equipped to handle litigation in the Western District of Virginia. Finally, the ends of justice do not require a transfer to the Northern District of Georgia. Turner alleges that Syfan's negligent hiring of DD led to an automobile death on Virginia roadways. Though Syfan's hiring of DD may have occurred in Georgia, the ill-effects of this allegedly negligent decision manifested in Rockingham County, Virginia, providing the court with a sufficient interest to adjudicate this matter in the Western District of Virginia.

Because Turner's choice of venue merits substantial weight and the operative factors do not strongly favor transfer of this matter to the Northern District of Georgia, Syfan's motion for transfer of this case to the Northern District of Georgia is **DENIED**.

## IV.

Finally, Syfan argues that Turner has failed to state a claim for negligent hiring and moves for dismissal under Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual matter which, accepted as true, "state[s] a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at

---

http://www.doav.virginia.gov/airports.htm. Further, Harrisonburg is just over two hours from Dulles Airport near Washington, D.C. Gainesville, Georgia is approximately one and half hours from Hartsfield-Jackson Airport in Atlanta, Georgia. Thus, travel to Harrisonburg, Virginia is not significantly more difficult than travel to Gainesville, Georgia.

555.  This plausibility standard requires a plaintiff to demonstrate more than "a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678.  When ruling on a motion to dismiss, the court must "accept the well-pled allegations of the complaint as true" and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997).  While the court must accept as true all well-pleaded factual allegations, the same is not true for legal conclusions.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678; see also Wag More Dogs, LLC v. Cozart, 680 F.3d 359, 365 (4th Cir. 2012) ("Although we are constrained to take the facts in the light most favorable to the plaintiff, we need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments.") (internal quotation marks omitted).  Thus, in order to survive a motion to dismiss, the complaint must present sufficient nonconclusory factual allegations to support a reasonable inference that the plaintiff is entitled to relief and the defendant is liable for the unlawful act or omission alleged.  See Francis v. Giacomelli, 588 F.3d 186, 196-197 (4th Cir. 2009) (citing Iqbal, 556 U.S. at 678-79, and Gooden v. Howard Cnty., Md., 954 F.2d 960, 969-70 (4th Cir. 1992) (en banc)).  Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

Turner's claim for negligent hiring of an independent contractor requires a showing of (1) physical harm to a third party, (2) caused by failure to exercise reasonable care to employ a competent and careful contractor, (3) to work which involves risk of physical harm unless it is skillfully and carefully done. Phillip Morris Inc. v. Emerson, 235 Va. 380, 399, 368 S.E.2d 268, 278 (Va. 1988)(citing Restatement Second of Torts §411).  Turner has alleged physical harm and death to Stever, satisfying the first element.  The third element is satisfied as "the operation of a tractor-trailer

on a public highway involves just such a risk of physical harm." <u>Jones v. C.H. Robinson Worldwide,</u> <u>Inc.</u>, 558 F. Supp. 2d 630, 642 (W.D.Va. 2008)(allowing a claim for negligent hiring of an independent contractor against a trucking logistics company to proceed past summary judgment based on data contained on the FMCSA's public website); <u>see</u> <u>also</u> <u>Schramm v. Foster</u>, 341 F. Supp. 2d 536 (D. Md. 2004)(permitting a claim for negligent hiring of an independent contractor trucking company to proceed to the jury). Syfan argues however that Turner has not adequately pled the second prong of a negligent entrustment claim.

Turner's claim relies on data and rankings contained on the FMCSA's website on or before November 12, 2014. This includes information that DD had a number of critical violations and an unsatisfactory ranking regarding the maximum number of service hours by its drivers, that these critical violations led to an unsatisfactory rating regarding hours of service by drivers, that several DD drivers were disqualified and forbidden to engage in interstate shipping, and that from June 2014 – November 2014, DD's rankings for driving safety ranged from the 1.9th to the 4th percentile and from the 8th to 11th percentile for hours of service compliance. ECF No. 1, at ¶ 8. A FMCSA SAFER report about DD available in November 2014 contained a number of cautionary signs related to DD's poor safety performance. <u>Id</u>. at ¶ 9.

Syfan argues the data and rankings contained on the FMCSA website are unreliable and inaccurate. ECF No. 6–1, 14-18, ECF No. 12, 14-18. Syfan cites the Fixing America's Surface Transportation Act (the "FAST Act"), enacted in 2015, and a disclaimer added to the FMCSA website in 2011 to argue that any reliance of the FMCSA website is misplaced. The FAST Act removed a significant portion of data and rankings from the public view on FMCSA website. ECF No. 6–1, 17. Likewise, the 2011 disclaimer states:

> Readers should not draw conclusions about a carrier's overall safety performance simply based on the data displayed in this system. Unless a motor carrier in the SMS has received an UNSATISFACTORY safety rating … or has otherwise been ordered

to discontinue operations by the FMCSA, it is authorized to operate on the nation's roadways.

ECF No. 12–6.

Syfan argues that the addition of the disclaimer in 2011 and passage of the FAST Act in 2015 distinguish the present facts from those before the court in <u>Jones</u>, which allowed a claim for negligent hiring and retention to proceed past summary judgment based on data and rankings on the FMCSA website. 558 F. Supp. 2d at 648. Syfan argues that the disclaimer on the FMCSA website when <u>Jones</u> was decided in 2007 differs materially from the disclaimer on the website when Syfan hired DD. ECF No. 12, 16-18. The disclaimer at issue in <u>Jones</u> read:

> Because of State data variations, FMCSA cautions those who seek to use the SafeStat data analysis system in ways not intended by FMCSA. Please be aware that use of SafeStat for purposes other than identifying and prioritizing carriers for FMCSA and state safety improvement and enforcement programs may produce unintended results and not be suitable for certain issues.

<u>Jones</u>, 558 F. Supp. 2d at 645-46. Thought the disclaimer added in 2011 contains specific language regarding carriers' overall safety performance, this addition does not render the present case distinguishable from <u>Jones</u>, particularly given that <u>Jones</u> was decided on summary judgment. Like the disclaimer in <u>Jones</u>, the disclaimer at issue here goes to the reliability of the data contained on the FMCSA website. As such, the facts at issue in the present case align squarely with those in <u>Jones</u>.

The FAST Act took effect after the alleged negligent conduct by Syfan occurred. Though the FAST Act, like the disclaimer, casts doubt on the reliability of the data and rankings on the FMCSA website, Syfan's argument again goes to weight of the evidence alleged by Turner and does not render Turner's claim implausible.

The court is compelled to view the facts in a light most favorable to Turner.  <u>Ibarra</u>, 120

F.3d at 474.  When viewed in such light, Syfan's argument fails to show that Turner's claim is

implausible.  As such, Syfan's motion to dismiss for failure to state a claim is **DENIED**.

**V.**

Syfan's Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction, Fed. R.

Civ. P. 12(b)(6) motion to dismiss for failure to state a claim, and alternative motion to transfer this

case to the Northern District of Georgia, ECF No. 6, are **DENIED**.  An Order will be entered to

that effect.

Entered:  4/18/2016

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge